# United States Court of Appeals
## For the First Circuit

No. 06-1942

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS SEGUNDO VILCHES-NAVARRETE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Lynch, and Howard,
Circuit Judges.

J. Michael McGuinness, with whom The McGuinness Law Firm was on brief, for appellant.
Mariana E. Bauzá-Almonte, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

April 10, 2008

**TORRUELLA, <u>Circuit Judge</u>, opinion of the court except as to Part II(A); dissenting in Part II(A).[1]** Appellant Luis Segundo Vilches-Navarrete ("Vilches") was convicted of: (1) possession with intent to distribute five kilograms or more of cocaine, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70503;[2] and (2) conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 46 U.S.C. § 70506(b) on multiple grounds. Vilches was apprehended for trafficking drugs in international waters by the United States Coast Guard ("USCG"). On appeal, he makes numerous arguments. He argues that the MDLEA is unconstitutional and that the district court lacked jurisdiction. He also challenges the district court's refusal to suppress evidence, to grant a motion to dismiss, as well as the sufficiency of the evidence upon which he was convicted. He claims that his sentence was unreasonable and that the numerous errors in the case prejudiced his right to a fair trial. After careful consideration, we affirm his conviction and the sentence imposed by the district court.

---

[1] Judges Lynch and Howard write the opinion of the court as to the issue considered in Part II(A). <u>See</u> <u>infra</u> at 35.

[2] At the time of Vilches's conviction, the MDLEA was at 46 U.S.C. app. § 1903(a). The MDLEA has since been recodified at 46 U.S.C. §§ 70506 - 70507.

# I. <u>Background</u>[3]

On January 31, 2005, during a routine drug patrol in the eastern Caribbean Sea, USCG Lieutenant Adam Nolen Berkley, whose boarding team was deployed on the British Royal Fleet's Auxiliary Ship, the <u>Wave Ruler</u>, received information from a maritime patrol aircraft about a vessel of interest in international waters. A cargo vessel heading north had smaller vessels coming alongside it, which raised the suspicion of the USCG. The USCG continued to monitor the vessel.

The next morning, using the British ship's helicopter, the USCG identified the vessel, the <u>Babouth</u>, which was flying the Honduran flag. As the USCG approached and performed a visual inspection, it made radio contact with the crew. Berkley was suspicious of the answers to some of his questions. He noted that the vessel had rub marks along the side; furthermore, it was rocking slowly back and forth. Berkley knew this to be a sign of a very heavy load. Additionally, the <u>Babouth</u> had an unusually large number of antennae, indicative of a great deal of electronic equipment on board for a vessel of this nature. Based on these factors, Berkley believed he had reasonable suspicion to approach the vessel. As he approached the <u>Babouth</u>, he raised the USCG flag,

---

[3] We recite the facts as found by the district court, consistent with record support. <u>See</u> <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 66 (1st Cir. 2004); <u>see also</u> <u>United States</u> v. <u>Vilches-Navarrete</u>, 413 F. Supp. 2d 60, 63-64 (D.P.R. 2006) (district court's factual findings).

converting the Wave Ruler into a law enforcement vessel. Berkley also faxed a report to the officer on duty at the USCG, Southern District, and followed up with a phone call requesting that the USCG contact the Honduran government for permission to board and search the Babouth. Thereafter, the Honduran government granted permission, first verbally, and later followed by an official, written communication.

The Babouth was fifty nautical miles west of Grenada, traveling in a north, northwesterly direction towards Puerto Rico and St. Croix when the USCG intercepted it. This area is a known drug trafficking area. Petty Officer Michael Christopher Acevedo, who was familiar with the area and its history of drug trafficking, boarded the Babouth with the permission of both the Government of Honduras and Vilches, its captain. Acevedo remained on the vessel for the duration of the search and was the officer in charge.

Upon inspection, Berkley noticed that the Babouth had too much free board. He also noticed that the vessel was rusty and looked to be in poor repair. The Babouth also had drums commonly used by drug traffickers, including a 500-gallon fuel container that smelled strongly of, and contained what looked like, gasoline. Vilches told the officers that it was a septic tank for the toilets. The officers inspected the tank, and observed that it did not lead to a toilet but to the back of the boat and over the side.

Acevedo asked Vilches for the registration documents and manifest of the Babouth.  Vilches turned over a briefcase with documents for the ship, and provided Acevedo with an affidavit prepared in Trinidad stating that the registration had been lost. Acevedo, however, found the vessel's registration in Vilches's briefcase; it had expired on December 14, 2004.

After a safety inspection and a search for weapons, the officers looked for indicators that the vessel was being utilized for smuggling contraband.  They found freshly painted areas, spilled concrete, a bag of concrete mix, and fresh welds, all of which are indicators of hidden compartments.  The sweep team also found other items which raised their suspicion about the contents of the vessel and the real purpose for which it was being used. Berkley and Acevedo found communication devices at the ship's bridge, similar to those Acevedo had seen in other drug seizure cases at sea.

The Babouth contained navigational charts without plot marks and a global positioning system ("GPS") that was not being used.  Vilches claimed that he did not use them because he was an experienced mariner.  Despite this assertion, while on board the Babouth, Acevedo noted that Vilches did utilize the charts and the GPS.

On the third day, another inspection team came to complete a space-accountability inspection.  The concrete blocks on

board, which Vilches had described as extremely sturdy, fell apart as the officers tried to move them. The inspection team found that the bill of lading for the ship's cargo conflicted with the ship's invoice. Vilches could not provide a satisfactory explanation for the discrepancy even though the ship's forms carried his seal and signature. In addition, Acevedo asked Vilches why they had been traveling so slowly since a cargo vessel would want to deliver its cargo quickly. Vilches blamed the slowness of the vessel on engine problems. He claimed that there was a hydraulic leak in the jacket of the water pump. Acevedo, a qualified mechanic, inspected the engine and found no hydraulic lines used for the jacket of the water pump.

By February 5, 2005, the Babouth was in U.S. waters, and a task force boarded the vessel and continued the search. Vilches consented to the search. For safety reasons, the vessel was taken to the USCG's station in San Juan, Puerto Rico. On February 7, 2005, while still searching the Babouth at the port, one of the Babouth's crew members, Luis Fernando Piedrahita-Calle ("Piedrahita"), communicated by note that he wanted to speak to the DEA.

Piedrahita met with the officers and told them where drugs were hidden and how the plan to smuggle the drugs was executed. Agents reboarded the Babouth and went to the area identified by Piedrahita. Vilches's attitude, which had been

cooperative, changed once the agents returned after receiving the note from Piedrahita. As the agents searched the back part of the vessel, Vilches became assertive and questioned the agents about their search. Following Piedrahita's instructions, the agents found a well-hidden hatch under the linoleum floor. Under about six to ten inches of sand, sawdust, and ammonia, the officers found a bolted manhole cover. Inside the manhole, they found several white burlap sacks which tested positive for cocaine. The agents recovered thirty-five bales of cocaine, weighing approximately 950 kilograms.[4] Earlier, a canine had detected a narcotic odor in the area later identified by Piedrahita.

### A. Indictment and Trial

After the USCG found the drugs on the boat, Vilches was arrested and charged with possession with the intent to distribute under the § 70503 of the MDLEA and with conspiracy to possess with intent to distribute under § 70506(b). On July 26, 2005, Vilches joined a co-defendant's motions to suppress the evidence and dismiss the indictment. The district court denied the motions.

Mardonio Chávez-Senti ("Chávez"), one of Vilches's co-defendants, pled guilty and testified at trial on behalf of the Government. He provided details of the conspiracy and of the day that the Babouth was intercepted by the USCG.

---

[4] The DEA confirmed that the substance in the bales was in fact cocaine with a ninety-one percent purity, valued between $2,500 and $16,000 per kilogram (depending on the location of the sale).

According to his testimony, Chávez, a naval mechanical engineer, met with Pedro Valleadares, Antonio Ruiz, Aldo Lara, and José Sandoval, and agreed to participate in the drug trafficking venture for $30,000. He testified that Vilches joined them in Haiti to help prepare for the drug run; the Babouth left Haiti for Tortola to pick up drugs.

Chávez recounted that at around midnight on January 31, 2005, Vilches called him and told him that they were at the prearranged point for the drug pick-up, but the boat bringing the drugs had not arrived. About an hour later, a motorboat, which Vilches was in contact with by radio, came up to the hull of the Babouth and people on the boat passed the bales of drugs up to the crew. The entire crew, with the exception of Vilches, who was piloting the vessel, participated in loading the drugs. A total of thirty-five bales were loaded. The motorboat then left. Chávez testified that the crew hid the bales in an empty water tank under the floor of the Babouth. The crew then informed Vilches that the job was complete. Vilches continued sailing, but was soon thereafter intercepted by the USCG.

Vilches was the only defense witness. He admitted being the captain of the Babouth, but denied any knowledge of the drugs on board. Vilches denied making any satellite phone calls and denied any knowledge of a boat coming alongside the Babouth. He claimed that there was no discrepancy as to the number of pallets,

-8-

despite the difference in quantity on the bill of lading and invoices. Though he admitted to knowing them, Vilches denied knowing how to contact either Sandoval or Lamberti. His address book, however, had contact information for both men; their names were highlighted in yellow. Vilches was also confronted with his falsified navigation license, for which he gave no satisfactory explanation.

Vilches moved for a Rule 29 dismissal under the Federal Rules of Criminal Procedure at the conclusion of the Government's case and again at the conclusion of his own case. The district court denied both motions. The jury found Vilches guilty on both counts. He did not move to set aside the verdict.

## B. Sentencing

Vilches's Pre-Sentencing Report ("PSR") grouped the two counts and calculated a base offense level of thirty-eight pursuant to U.S.S.G. § 2D1.1(c)(1). Taking into account Vilches's role as captain of the Babouth, the PSR added two levels pursuant to U.S.S.G. § 2D1.1(b)(2), for a total offense level of forty. Although Vilches had a prior record, the PSR calculated zero criminal history points, resulting in a criminal history category of I, because his convictions fell outside of the time limit for inclusion. See U.S.S.G. § 4A1.2(e)(1). The PSR calculated an advisory guideline range of 292 to 365 months. The PSR included the statutory minimum term of ten years and a maximum of life. It

noted that Vilches is a Chilean citizen with no legal status in the United States and that he would face removal proceedings upon completion of his sentence.  No objections were filed to the PSR.

At the sentencing hearing held on May 19, 2006, Vilches's counsel requested that the court take into account the 18 U.S.C. § 3553(a) sentencing factors, and argued that a sentence of 292 months, the bottom of the Guidelines range, would be adequate considering Vilches's age.  Counsel argued that a higher sentence for Vilches's crime, which did not involve violence, "could be interpreted as punishment because he exercised his right to jury trial."  When Vilches addressed the court, he insisted he was innocent.  The Government called attention to Vilches's history and characteristics under § 3553(a) and requested a sentence at the top of the guideline range, 365 months.

Consistent with the PSR, the district court calculated Vilches's sentence between 292 and 365 months.  Taking into account the advisory guidelines and the § 3353(a) factors, the district court sentenced Vilches to 365 months for each count, to be served concurrently.  The court noted that Vilches's prior drug-related convictions were indicative of his recidivism.  The court found that "a sentence at the top of the guideline range is the appropriate and the reasonable sentence."  The court imposed an additional sentence of concurrent five-year terms of supervised

release and a mandatory special monetary assessment, and upon motion declined to reconsider the sentence.

Vilches appeals and challenges the constitutionality of the MDLEA, the district court's jurisdiction, the district court's refusal to suppress evidence, the sufficiency of the evidence, and the reasonableness of his sentence, and argues for reversal based on a totality of errors. We address these challenges in turn.

## II. Discussion

### A. Constitutionality of the MDLEA

Once again, we are asked to decide the constitutionality of the jurisdictional element of the MDLEA. See United States v. Gil-Carmona, 497 F.3d 52, 54 (1st Cir. 2007). The MDLEA makes it a crime for any person on board "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1), to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance," 46 U.S.C. § 70503(a). A "vessel subject to the jurisdiction of the United States" includes a "vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States." Id. at § 70502(c)(1)(C).[5]

---

[5]   In 1996, Congress amended the MDLEA, with the Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 1138(a)(5), 110 Stat. 3901, and deemed jurisdiction over vessels a preliminary question of law. See 46 U.S.C. § 70504 ("Jurisdiction of the United States with respect to vessels subject to this chapter is

-11-

Although the concurrence feels compelled to resolve this issue, the doctrine of constitutional avoidance requires us to refrain from ruling on the constitutionality of this statute because the posture of this case does not <u>require</u> us to pass upon this issue.[6]  I believe we should not reach the merits of the

---

not an element of any offense.  All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.").  Since the amendment, judges have taken on the task of determining of whether a "vessel [is] subject to the jurisdiction of the United States."  <u>Id.</u> at § 70503(a)(1); <u>see also</u> <u>United States</u> v. <u>Cardales</u>, 168 F.3d 548, 554 n.3 (1st Cir. 1999) ("The MDLEA has since been amended to eliminate jurisdiction as one of its elements, making it a threshold question for the trial court to resolve.").

[6]  The maxim that courts should not decide constitutional issues when this can be avoided is as old as the Rocky Mountains and embedded in our legal culture for about as long.  As early as 1885, the Supreme Court said that the Court, "[i]n the exercise of [deciding the constitutionality of laws], . . . is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."  <u>Liverpool, N.Y. & Phila. S.S. Co.</u> v. <u>Comm'rs of Emigration</u>, 113 U.S. 33, 39 (1885).  The first rule is clearly applicable here.  <u>See</u> <u>United States</u> v. <u>Resendiz-Ponce</u>, 127 S. Ct. 782, 785 (2007) ("'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.'" (quoting <u>Ashwander</u> v. <u>Tenn. Valley Auth.</u>, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))); <u>Hein</u> v. <u>Freedom From Religion Found., Inc.</u>, 127 S. Ct. 2553, 2562 (2007) ("[F]ederal courts . . . must 'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function.'" (quoting <u>Valley Forge Christian Coll.</u> v. <u>Ams. United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 474 (1982))); <u>Elk Grove Unified Sch. Dist.</u> v. <u>Newdow</u>, 542 U.S. 1, 11 (2004); <u>Christopher</u> v. <u>Harbury</u>, 536 U.S. 403, 417 (2002); <u>Dep't of Commerce</u> v. <u>U.S. House of Representatives</u>, 525 U.S. 316, 343-44 (1999); <u>Clinton</u> v. <u>Jones</u>, 520 U.S. 681, 690 n.11 (1997) (quoting <u>Rescue Army</u> v. <u>Mun. Court of Los Angeles</u>, 331 U.S. 549, 570 n.34 (1947)); <u>Lyng</u> v. <u>Nw. Indian</u>

-12-

Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (citing Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Eng'g, P.C., 467 U.S. 138, 157 (1984))); Jean v. Nelson, 472 U.S. 846, 854 (1985); United States v. Locke, 471 U.S. 84, 93 (1985); Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 (1981); N.Y. City Transit Auth. v. Beazer, 440 U.S. 568, 582 (1979); Culombe v. Connecticut, 367 U.S. 568, 636 (1961) (the Court should "declare legal principles only in the context of specific factual situations, and . . . avoid expounding more than is necessary for the decision of a given case") (Warren, C.J., concurring); Tenn. Valley Auth., 297 U.S. at 346 ("The Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.") (Brandeis, J., concurring); id. at 347 ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." (citations omitted)); Ala. State Fed'n of Labor v. McAdory, 325 U.S. 450, 461 (1945); Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."); Blair v. United States, 250 U.S. 273, 279 (1919) ("Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function."); Light v. United States, 220 U.S. 523, 538 (1911); Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 193 (1909); Burton v. United States, 196 U.S. 283, 295 (1905).

The circuit courts, including this one, have repeatedly heeded the Supreme Court's command mandating avoidance of unnecessary constitutional rulings. See Fox Television Stations, Inc. v. Fed. Commc'ns Comm'n, 489 F.3d 444, 462 (1st Cir. 2007) ("'A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting Lyng, 485 U.S. at 445)); United States v. Coker, 433 F.3d 39, 50-51 (1st Cir. 2005). Within

constitutionality of this law because Vilches has not demonstrated

_____

the last decade alone, every circuit has wisely followed the Court's lead. See, e.g., Pa. Prison Soc. v. Cortés, 508 F.3d 156, 162 (3d Cir. 2007); Neumont v. Florida, 451 F.3d 1284, 1285 (11th Cir. 2006); Bechtel v. Competitive Techs., Inc., 448 F.3d 469, 475 (2d Cir. 2006); Lee v. Walters, 433 F.3d 672, 677 (9th Cir. 2005); Nicholson v. Scoppetta, 344 F.3d 154, 167 (2d Cir. 2003); United States v. Lamont, 330 F.3d 1249, 1251 (9th Cir. 2003); Doe v. Heck, 327 F.3d 492, 528 (7th Cir. 2003); City of Abilene v. E.P.A., 325 F.3d 657, 660 (5th Cir. 2003); Campanelli v. Allstate Life Ins. Co., 322 F.3d 1086, 1093 (9th Cir. 2003); Stillman v. C.I.A., 319 F.3d 546, 548 (D.C. Cir. 2003); SOB, Inc. v. County of Benton, 317 F.3d 856, 885 (8th Cir. 2003); Olympic Arms, et al. v. Buckles, 301 F.3d 384, 388 (6th Cir. 2002); United States v. Elkins, 300 F.3d 638, 647 (6th Cir. 2002); United States v. Suerte, 291 F.3d 366, 368 (5th Cir. 2002); Koch v. Town of Brattleboro, Vt., 287 F.3d 162, 166 (2d Cir. 2002); Univ. of Great Falls v. N.L.R.B., 278 F.3d 1335, 1340-44 (D.C. Cir. 2002); Grid Radio v. F.C.C., 278 F.3d 1314, 1322 (D.C. Cir. 2002); Coleman v. Mitchell, 268 F.3d 417, 432 (6th Cir. 2001); Allstate Ins. Co. v. Serio, 261 F.3d 143, 149-50 (2d Cir. 2001); ISI Int'l Inc. v. Borden Ladner Gervais LLP, 256 F.3d 548, 552 (7th Cir. 2001); Adams v. City of Battle Creek, 250 F.3d 980, 986 (6th Cir. 2001); Eldred v. Reno, 239 F.3d 372, 378 (D.C. Cir. 2001); United States v. Westmoreland, 240 F.3d 618, 629 (7th Cir. 2001); Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1219 (11th Cir. 2000); Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehabilitative Servs., 225 F.3d 1208, 1227 n.14 (11th Cir. 2000); Kalka v. Hawk, 215 F.3d 90, 97 (D.C. Cir. 2000); Bell Atlantic Md., Inc. v. Prince George's County, Md., 212 F.3d 863, 865 (4th Cir. 2000); West v. Derby Unified Sch. Dist. No. 260, 206 F.3d 1358, 1367 (10th Cir. 2000); United States v. Kaluna, 192 F.3d 1188, 1197 (9th Cir. 1999); Kelly v. Marcantonio, 187 F.3d 192, 197 (1st Cir. 1999); Osage Tribal Council ex rel. Osage Tribe of Indians v. U.S. Dep't of Labor, 187 F.3d 1174, 1180 n.1 (10th Cir. 1999); Nelson v. Miller, 170 F.3d 641, 648 (6th Cir. 1999); United States v. Cisneros, 169 F.3d 763, 768 (D.C. Cir. 1999).

Bickel's arguments in favor of constitutional avoidance are no less true today than they were over forty-five years ago. See generally, Alexander M. Bickel, The Least Dangerous Branch (1962); Alexander M. Bickel, The Supreme Court, 1960 Term -- Foreword: The Passive Virtues, 75 Harv. L. Rev. 40 (1961). See also Abner J. Mikva, Why Judges Should Not Be Advicegivers, 50 Stan. L. Rev. 1825, 1831 (1998); Cass R. Sunstein, The Supreme Court, 1995 Term -- Forward: Leaving Things Undecided, 110 Harv. L. Rev. 6 (1996).

that the district court committed plain error.  I thus disagree with the reaching of this issue by the concurring opinion by Judges Lynch and Howard and express no opinion at this time on this matter.

The standard of review for a defendant's claim that his constitutional rights were violated by congressional removal of an element of a charged offense from the jury's consideration is ordinarily harmless error.  See Neder v. United States, 527 U.S. 1, 15 (1999).  Here, however, we apply plain error because Vilches did not object to the constitutionality of the statute in the district court.  See United States v. Brown, 510 F.3d 57, 72 (1st Cir. 2007).  Under the plain error standard, Vilches must prove "(1) an error, (2) that is plain, and (3) that affects substantial rights," United States v. Connolly, 341 F.3d 16, 31 (1st Cir. 2003) (quoting United States v. Downs-Moses, 329 F.3d 253, 263 (1st Cir. 2003)) (internal quotation marks omitted), and that the error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Matos, 328 F.3d 34, 43 (1st Cir. 2003) (internal quotation marks omitted).

Like in Gil-Carmona, the district court record clearly shows that the jury was presented with evidence that the Babouth was subject to the jurisdiction of the United States.  At trial, Berkley testified that while the Babouth was apprehended in international waters, he requested and was granted both verbal and

written permission, through the USCG, Seventh District, by the Government of Honduras to board and search the Babouth pursuant to the Honduran-U.S. Counter Drugs Operations bilateral agreement. See Certification for the Maritime Drug Law Enforcement Act Case Involving the Vessel Babouth (Honduras). The MDLEA allows for U.S. officials to conduct searches on foreign flagged vessels with permission of the foreign state. See 46 U.S.C. § 70502(c)(2)(A), (B).[7] The Government presented the district court with documentation containing the Seal of the United States Department of State which stated that the Government of Honduras had granted the United States permission to enforce U.S. law against the Babouth, its cargo, and the people on board. See United States v. Guerrero, 114 F.3d 332, 340 n.9 (1st Cir. 1997) ("We acknowledge that the 1996 amendments to § 1903 provide that the Secretary of State's certification 'conclusively' proves a foreign nation's consent.").

Vilches did not object to the Government's arguments regarding jurisdiction at trial. His failure to object alone suggests that the asserted error was not plain. Cf. Gil-Carmona, 497 F.3d at 55. In fact, at trial, Vilches had the opportunity to question the Government's presentation with regard to jurisdiction,

---

[7] "Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States . . . may be obtained by radio, telephone, or similar or electronic means, and is conclusively proved by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. § 70502(c)(2)(A).

but he chose merely to question how long it took between the time Berkley saw the Honduran flag and when he received permission to board the vessel. "[T]he record establishes beyond a reasonable doubt that jurisdiction over the vessel existed under [§70504]." Id. Even if the jury had been expressly presented with the question of jurisdiction, any reasonable jury would have found Vilches guilty. It cannot be said that any error in failing to submit the question of jurisdiction to the jury "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001); cf. Gil-Carmona, 497 F.3d at 55; Neder, 527 U.S. at 19. There was no plain error.

## B. Jury Instruction on Jurisdiction

Vilches argues that the district court's jury instruction was erroneous because it "improperly invaded the province of the jury determinations and violated the Apprendi principle."[8] Normally, this issue would be subject to de novo review. See United States v. Bravo, 489 F.3d 1, 7 (1st Cir. 2007). Vilches, however, made no objection below, and we review a claim of error not properly preserved below for plain error. See United States v. v. Cotton, 535 U.S. 625, 627-29 (2002) (holding that a defendant's

---

[8] The Supreme Court held in Apprendi v. New Jersey, 530 U.S. 466 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.

failure to object to Apprendi error at trial requires plain error review); United States v. Portes, 505 F.3d 21, 25 (1st Cir. 2007).

The MDLEA provides that "[j]urisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a). The district court correctly instructed the jury that the "[j]urisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense." Id. In its jury instruction, the district court plainly said: "I'm instructing you that as a matter of law the motor vessel Babouth was subject to the jurisdiction of the United States." This was a correct statement of the law. See Guerrero, 114 F.3d at 340 n.9 ("United States jurisdiction over vessels is no longer an element of an offense, but rather, a preliminary question of law for the trial judge"); United States v. Tinoco, 304 F.3d 1088, 1106 (11th Cir. 2002) ("The statutory language of the MDLEA now unambiguously mandates that the jurisdictional requirement be treated only as a question of subject matter jurisdiction for the court to decide."). At the conclusion of the jury instructions the district court asked whether there were any objections to the instruction. Vilches's counsel said no. There was no plain error.

### C. Motions to Suppress and Dismiss

"We apply a mixed standard of review to the district court's denial of a suppression motion, reviewing the court's

-18-

findings of fact for clear error and the application of the law to those facts de novo." Bravo, 489 F.3d at 8 (citing Tinoco, 304 F.3d at 1116).

Vilches argues that his Fourth Amendment rights were violated because the USCG lacked reasonable suspicion to search the Babouth. Vilches further argues that Rule 5(a) of the Federal Rules of Criminal Procedure were violated because it took five days for the USCG to get the Babouth to port in San Juan.[9]

Vilches further contends that he was erroneously denied a suppression hearing and that this error unconstitutionally precluded him from properly developing and supporting his motion to suppress. Vilches also argues that the district court erred in holding that he lacked standing to challenge the constitutionality of the stop and seizure. Vilches further argues that the warrantless detention of his person for several days constituted a de facto arrest and that the scope of the detention was unreasonable. We are unconvinced by any of Vilches's arguments and take them in turn.

### 1. Alleged Fourth Amendment Violation

As we have said before, "the Fourth Amendment does not apply to activities of the United States against aliens in

---

[9] The rule provides that "any person making arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate." Fed. R. Crim. P. 5(a).

-19-

international waters." Bravo, 489 F.3d at 8; see also United States v. Verdugo-Urquídez, 494 U.S. 259, 267 (1990) ("There is . . . no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."). Vilches is Chilean, and he was not residing in the United States. He was in international waters when he was approached by the USCG. The district court properly dismissed Vilches's Fourth Amendment claim pertaining to the USCG's actions in international waters.

The district court also properly extended the same reasoning when it dismissed Vilches's Fourth Amendment claim based on the search of the Babouth at the port in San Juan. In Verdugo-Urquídez, the Supreme Court held that the defendant did not have constitutional rights based on his presence in the United States because constitutional protections only attach to aliens who "come within the territory of the United States and developed substantial connections with this country." Verdugo-Urquídez, 494 U.S. at 271. Vilches can claim no such "substantial connections." Like Verdugo-Urquídez, who was imprisoned in California and had "no previous significant voluntary connection to the United States," id., Vilches was brought to the United States for the sole purposes of conducting a safe search of the vessel he captained. "[T]his sort of presence -- lawful but involuntary -- is not of the sort to

indicate any substantial connection with our country." Id. In this case, we are unable to say that Vilches's presence at the port in San Juan was completely involuntary because he consented to the search and the USCG's docking the Babouth in San Juan.

But even if Verdugo-Urquídez does not apply, Vilches lacks standing to challenge the search. It is "well settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have 'standing' to claim that an illegal search or seizure occurred." United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993) (citing Rakas v. Illinois, 439 U.S. 128, 138-48 (1978)). In order to make such a showing, Vilches must show that he had both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable. California v. Greenwood, 486 U.S. 35, 39 (1988); cf. United States v. Scott, 975 F.2d 927, 928 (1st Cir. 1992). The burden of proving a reasonable expectation of privacy lies with Vilches. United States v. Sánchez, 943 F.2d 110, 113 (1st Cir. 1991). Vilches must demonstrate an expectation of privacy in both the item seized and the place searched. United States v. Salvucci, 448 U.S. 83, 93 (1980). Vilches cannot make that showing here.

"[T]he circumstances and exigencies of the maritime setting afford people on a vessel a lesser expectation of privacy than in their homes, obviating the usual fourth amendment

-21-

requirements of a warrant." United States v. Green, 671 F.2d 46, 53 (1st Cir. 1982). As the Government argues, Vilches had no reasonable expectation of privacy in the secret compartment in which the drugs were found. Cf. United States v. Cardona-Sandoval, 6 F.3d 15, 22 (1st Cir. 1993) (distinguishing "substantial vessels such as cargo ships and freighters" from "a small pleasure craft used for fishing" where captain had reasonable expectation of privacy).

Even if Vilches had a subjective expectation of privacy, it was not an objectively reasonable expectation. The district court rightly noted that "society would not recognize a justifiable expectation of privacy in a hidden compartment created for the express purpose of hiding illicit contraband. To hold otherwise would grant smugglers standing under the Fourth Amendment solely because they were careful in hiding their illicit merchandise." Vilches-Navarrete, 413 F. Supp. 2d at 73-74; see also United States v. Sarda-Villa, 760 F.2d 1232, 1235 (11th Cir. 1985) ("[W]e are not willing to say that society is prepared to recognize a justifiable expectation of privacy solely on the basis of appellants' efforts to secret the contraband. Drug smugglers cannot assert standing solely on the basis that they hid the drugs well and hoped no one would find them."). As the Supreme Court said in Kyllo v. United States, 533 U.S. 27 (2001), "a Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective

expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"  Id. at 33 (quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

The search was valid in any event because the USCG's "authority under 14 U.S.C. § 89(a) to stop and board a vessel on the high seas is quite broad."[10]  Cardona-Sandoval, 6 F.3d at 23 (internal footnotes omitted).  In the instant case, the USCG had consent from Honduras, the vessel's flag country, to board the Babouth and to take it to a U.S. port to complete the search.  The USCG also possessed the requisite "reasonable and articulable grounds for suspecting that the vessel or those on board [we]re engaging in criminal activity."  Green, 671 F.2d at 53.

---

[10]  14 U.S.C. § 89(a) provides, in relevant part:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or the operation of any law, of the United States, address inquiries to those on board, examine the ships documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be immediately pursued and arrested on shore, or other lawful appropriate action shall be taken.

-23-

As the USCG's monitored the Babouth, it observed smaller vessels coming into contact with it the night before the USCG boarded the vessel. The following day the USCG detected rub marks along the port side of the Babouth but not its starboard, confirming their belief in suspicious activity. On board, the USCG's found even more evidence of suspicious activity. For example, there was a discrepancy between the number of pallets that the Babouth was carrying and those that were slated for delivery, and the GPS and navigational charts had been erased.

Each step of the USCG's search was based on "a corresponding level of suspicion supported by specific facts." Cardona-Sandoval, 6 F.3d at 23. In United States v. Berryman, 717 F.2d 651 (1st Cir. 1983), we said that "although some encounters [with the Government] do not implicate fourth amendment concerns at all, more intrusive encounters short of arrests must be justified by reasonable suspicion proportional to the degree of the intrusion. That suspicion cannot be inchoate, but must be based on 'specific and articulable facts . . . together with rational inferences from those facts' in order to establish a basis for review of the police actions." Id. at 653 (internal citations omitted). The USCG had the requisite reasonable suspicion.

Furthermore, as the district court found, Vilches "gave his permission to the boarding team 'to access any space on the vessel.'" Vilches-Navarrete, 413 F. Supp. 2d at 72. Both at sea

-24-

and at the port in San Juan, Vilches consented to the USCG's boarding of the Babouth and the search of the vessel. At no point did he object to the boarding of the vessel, the search of the vessel, or the taking of the vessel to San Juan. "It is . . . well settled that one of the specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also United States v. Meléndez, 301 F.3d 27, 32 (1st Cir. 2002). Additionally, as mentioned above, Honduras, under whose flag the Babouth sailed, consented to the search of the boat both at sea and in U.S. territory.

Accordingly, the denial of the motion to suppress is affirmed.

### 2. Motion to Suppress Hearing

"The test for granting an evidentiary hearing in a criminal case [is] substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?" United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990). Vilches made no such showing. A hearing was not necessary to address the suppression issues because in support of his motion, Vilches merely presented the same statements by the USCG as the Government had. Vilches did not dispute the Government's version of events and instead relied upon then. This makes an evidentiary

-25-

hearing unnecessary since there were no material facts that were in dispute. See id. at 1273-74; United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) ("[E]videntiary hearings on motions are the exception, not the rule.").

### 3. Vilches's Arrest

Vilches's challenge to his arrest is without merit. There was no unreasonable delay between the arrest and Vilches's initial appearance before a magistrate judge. Vilches was arrested the same day that the USCG discovered the drugs on the Babouth, February 7, 2005. He was taken before a magistrate judge the following day. Furthermore, the short interval between when the USCG first boarded and inspected the Babouth and the travel time before the Babouth arrived in San Juan did not result in a custodial detention. See United States v. Baker, 641 F.2d 1311, 1319 (9th Cir. 1981) ("routine Coast Guard boarding of vessels does not create a custodial situation"); cf. United States v. Elkins, 774 F.2d 530, 535 n.3 (1st Cir. 1985) ("It is well recognized that a routine inspection and boarding of an American flagship vessel on the high seas does not give rise to a custodial detention."). The one day between the time Vilches was arrested and when he was brought before the magistrate judge was reasonable, and the district court properly denied his motion to dismiss.

### D. Sufficiency of the Evidence

We review a sufficiency of the evidence claim de novo. See United States v. Carucci, 364 F.3d 339, 343 (1st Cir. 2004). We will affirm a conviction if, "after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). "All 'reasonable evidentiary inferences' are to be drawn 'in harmony with the verdict,' and 'all issues of credibility' are to be resolved 'in the light most favorable to the government.'" United States v. Washington, 434 F.3d 7, 15 (1st Cir. 2006) (quoting United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004)).

Vilches argues that no rational trier of fact could have found all of the essential elements of the crimes of possession with intent to distribute cocaine and conspiracy to possess with intent to distribute. He claims that the Government offered "thin isolated points of purported circumstantial evidence," which under scrutiny are easily explained away. A review of the evidence presented at trial indicates otherwise.

### 1. Conspiracy

Vilches notes that a conviction for conspiracy requires proof beyond a reasonable doubt of three elements: (1) the

existence of an agreement to commit an unlawful act; (2) knowledge and intent to join the agreement; and (3) knowing participation in the conspiracy. United States v. Sepúlveda, 15 F.3d 1161, 1173 (1st Cir. 1993). He argues that the Government's evidence at trial was insufficient to establish any of the three elements. We disagree.

At trial, the Government established beyond a reasonable doubt "the existence of a conspiracy, [Vilches's] knowledge of the conspiracy, and [Vilches's] voluntary participation in the conspiracy." United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990). As we made clear above, the Government proved beyond a reasonable doubt that the Babouth was "subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1). There is no question or dispute that the USCG found cocaine, undoubtedly a controlled substance, on the Babouth. The Government also proved at trial that Vilches "knowingly or intentionally possessed the controlled substance with the intent to distribute it." Guerrero, 114 F.3d at 339.

Chávez specifically testified to the details of the conspiracy. See United States v. Cardales, 168 F.3d 548, 554-55 (1st Cir. 1999). Chávez testified to Vilches's involvement in the conspiracy. Specifically, once the Babouth departed Haiti, Vilches was in constant contact with the owner of the drugs, Félix Lamberti. While sailing, Vilches informed Chávez when they reached

-28-

the predetermined meeting place for receiving the drugs. Vilches is the one who received the call from the motorboat that was carrying the drugs giving its location. Vilches ordered that the Babouth reduce its speed so the drugs could be loaded onto the boat. After the crew loaded the cocaine and hid it under a hatch, they informed Vilches that the drugs were safely on board. Vilches then ordered them to resume their normal speed. The Government met its burden.

## 2. Possession

With respect to the possession charge, Vilches again argues that there was insufficient evidence that he knowingly possessed the narcotics found on the Babouth. He maintains that the Government failed to meet its burden of proving that he had both knowledge of and access to the narcotics. See United States v. Patterson, 472 F.3d 767, 779 (10th Cir. 2006). The facts -- recounted above -- belie his assertions of innocence.

Viewed in the light most favorable to the verdict, the evidence is sufficient to sustain the jury's verdict because it is clear that a reasonable factfinder could find that the Government proved the essential elements of crimes with which Vilches was accused.

## 3. Circumstantial Evidence

Vilches claims that the Government's circumstantial evidence does not withstand scrutiny and should be discounted.

Contrary to Vilches's claims, the Government introduced sufficient circumstantial evidence at trial to support his conviction. "In circumstantial cases . . ., the evidence is sufficient to convict if it adequately supports 'the requisite two-step inference': (1) that the vessel was engaged in obviously illegal activity, and (2) that each Appellant was ready to assist in the criminal enterprise." Bravo, 489 F.3d at 9 (quoting United States v. Jiménez-Pérez, 869 F.2d 9, 11 (1st Cir. 1989)); Guerrero, 114 F.3d at 342 ("proof of sufficient participation in the crime, as well as knowledge of it, is required to convict:  the defendant's 'mere presence' at the scene of the criminal activity is not enough"). Vilches's challenge to the sufficiency of the evidence supporting his convictions attacks only the weight of the evidence; that is insufficient here. He fails to demonstrate that the circumstantial evidence the Government offered is somehow inadequate to meet the test we laid out in Bravo.  There was substantial evidence establishing each element of the possession and conspiracy convictions.  His arguments are unavailing.

The reason the Babouth came to the attention of the USCG is that they detected vessels coming alongside it under the cover of darkness.  The Government presented evidence that the USCG found this suspicious because a vessel of the size of the Babouth would be unlikely to stop in the dark, in the middle of the ocean, for any legitimate reason to take small boats alongside it.  The

Government also presented evidence that the vessel had unusually excessive electronic equipment, which was inconsistent with its condition; this was consistent with other drug trafficking ventures. Moreover, the USCG intercepted the Babouth in an area well-known for drug trafficking.

There was also evidence that on board the Babouth the officers found indicators of illicit activity and supplies that were consistent with the possibility of empty space behind a false wall. The USCG found fifty-gallon drums, typical of those which could be used by vessels to refuel smaller vessels transporting contraband. A large 500-gallon container, which Vilches claimed to be a septic tank, was also found by the USCG. Upon inspection, the USCG found evidence indicating that it contained gasoline and was not used as a septic tank. Additionally, the Babouth's GPS and navigational charts did not display the ship's prior course. Despite Vilches's explanation that he was a seasoned mariner and did not need to use the GPS and charts, the officers witnessed Vilches use them later.

The Babouth's registration, which Vilches claimed he lost, was later discovered in his briefcase by agents during the search. Furthermore, Vilches's navigational license was fraudulent. The Government also introduced evidence that Vilches was hired by Sandoval, who was present at the meeting in which Chávez was hired for the drug smuggling venture. Vilches testified

that as the captain, he was the one to give the orders; nothing could occur on the boat without his orders.  Vilches attempted to explain away the suspicions at trial; the jury chose not to believe him.  The circumstantial evidence overwhelmingly weighs against Vilches.  The evidence presented at trial is more than sufficient to sustain the jury's verdict.

### E.  Sentence

We "review challenges to sentencing process -- i.e., errors of law –- de novo."  United States v. Rivera, 448 F.3d 82, 84 (1st Cir. 2006) (citing United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005)).  "Reasonableness challenges -- i.e., challenges to errors of judgment -- are reviewed with 'some deference . . . [a]ssuming a plausible explanation and a defensible overall result.'"  Id. (quoting United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006)); see also Gall v. United States, 128 S. Ct. 586, 602 (2007) ("On abuse-of-discretion review, the Court of Appeals should have given due deference to the District Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence.").

Vilches argues that the 365-month sentence imposed on him was a "de facto life sentence."  He argues that the sentence was unreasonable under United States v. Booker, 543 U.S. 220 (2005), because it was not predicated on the factors listed in § 3553(a).  The question for this court is whether the district court's

conclusion is supported by "a reasoned explanation [and] a plausible outcome." Jiménez-Beltre, 440 F.3d at 519; see also United States v. Zapete-García, 447 F.3d 57, 60-61 (1st Cir. 2006).

The district court imposed a 365-month sentence after noting that the Guidelines are advisory and after considering the sentencing factors listed in § 3553(a). The district court noted Vilches's conduct, including his knowledge of the drug smuggling operation despite his assertion of ignorance. The district court also discussed his prior criminal record, including his 1981 conviction for possession with intent to distribute, and his 1983 conviction, where he received 120 months for possession of marijuana. The district court did not count Vilches's previous convictions towards his criminal history because of their dates but found them to be indicative of his recidivism. See 18 U.S.C. § 3553(a)(2)(B) (giving judges latitude to imposes sentences that "afford adequate deterrence to criminal conduct"). Finally, the district court considered the fact that Vilches had used a different name in the past. Given the district court's consideration of the § 3553(a) factors and its reasoned articulation for the sentence, Vilches's 365-month sentence is reasonable. The district court's reasoning was persuasive and explicit, and the result was proper. The district court's sentence is affirmed.

### F.  Totality of the Errors

Vilches argues that under the "cumulative error doctrine," "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect."  Sepúlveda, 15 F.3d at 1195-96.  Vilches asserts that in this case, the numerous errors prejudiced his rights to a fair trial and violated due process under the Fifth and Sixth Amendments.  We find these arguments unconvincing.  For the reasons elaborated above, we find that even if there were errors -- a question we need not answer --  they were harmless.  Vilches's claim necessarily fails.  See United States v. Flemmi, 402 F.3d 79, 95 n.23 (1st Cir. 2005) ("[B]ecause we have found that none of [the defendant's] individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error." (quoting United States v. DeMasi, 40 F.3d 1306, 1322 (1st Cir. 1994))) (internal quotation marks omitted).

### III.  Conclusion

For the reasons explained above, we affirm Vilches's conviction and sentence.

**Affirmed**.


"**Opinion in part and Concurrence in part follows**"

-34-

**LYNCH and HOWARD, <u>Circuit Judges</u>, opinion of the court in part and concurring in part.** We join Judge Torruella's opinion except as to Part II(A) ("Constitutionality of the MDLEA"). We write separately to address the constitutionality of 46 U.S.C. § 70504(a), a question Judge Torruella's opinion bypasses.

We hold that there is no constitutional infirmity in Congress's explicit allocation in § 70504(a) of the question of whether a vessel is "subject to the jurisdiction of the United States" to the court rather than the jury for decision. That allocation was well within the power of Congress.

Vilches did not raise a challenge to the statute's constitutionality in the district court and so our review is for plain error. <u>United States</u> v. <u>JG-24, Inc.</u>, 478 F.3d 28, 32 (1st Cir. 2007). To establish plain error, Vilches must demonstrate that "(1) there was error; (2) the error was plain; (3) the error affected [his] substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Riggs</u>, 287 F.3d 221, 224 (1st Cir. 2002). We resolve this claim at the first step on the grounds that there was no error at all. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Arango</u>, 508 F.3d 34, 43 (1st Cir. 2007); <u>United States</u> v. <u>Vargas</u>, 471 F.3d 255, 264 (1st Cir. 2006); <u>United States</u> v. <u>Morales-Rodríguez</u>, 467 F.3d 1, 16 (1st Cir. 2006).

Under 46 U.S.C. § 70503(a)(1), an individual "may not knowingly or intentionally manufacture or distribute, or possess with intent to distribute, a controlled substance on board . . . a vessel of the United States or a vessel subject to the jurisdiction of the United States." In 1996, Congress moved to end the disagreement among lower courts as to whether the determination that a vessel was subject to the jurisdiction of the United States was committed to a jury or a judge. Congress did so by inserting a provision explicitly providing that jurisdiction under this statute is a preliminary question for the judge and is not an element of the crime that must be submitted to the jury. The statute, 46 U.S.C. § 70504(a), provides that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."

To date one circuit has upheld the constitutionality of this provision. United States v. Tinoco, 304 F.3d 1088, 1111 (11th Cir. 2002). One circuit has held the provision unconstitutional. United States v. Perlaza, 439 F.3d 1149, 1167 (9th Cir. 2006).

In this case, the Coast Guard sought permission from Honduras to board the vessel Babouth, which was flying a Honduran flag. The prosecution submitted a certificate from the Secretary of State as verification that the United States received such

-36-

permission from Honduras.[11]  Vilches argues that the vessel was not subject to the jurisdiction of the United States and the government failed to make the required showing that it was.  The argument we address is his contention that § 70504(a) is unconstitutional because, by assigning the issue to a judge, the statute violates his Fifth and Sixth Amendment rights to have every element of a criminal offense decided by a jury beyond a reasonable doubt.  We disagree.  This issue is not an element of the crime in the requisite sense and may be decided by a judge.

Congress enjoys latitude in determining what facts constitute elements of a crime which must be tried before a jury and proved beyond a reasonable doubt and which do not.  See, e.g., Staples v. United States, 511 U.S. 600, 604 (1994) (noting that the "definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute" (quoting Liparota v. United States, 471 U.S. 419, 424 (1985)) (internal quotation mark omitted)); McMillan v. Pennsylvania, 477 U.S. 79, 86 (1986) ("[W]e should hesitate to conclude that due process bars the State from pursuing its chosen course in the area of defining crimes and prescribing penalties.").

---

[11]   Under 46 U.S.C. § 70502(c)(2)(B), the consent of a foreign nation to the enforcement of United States law by the United States is "proved conclusively by certification of the Secretary of State or the Secretary's designee."

This discretion about allocation of functions between judge and jury is subject to some limits. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).[12] Congress acted well within constitutional boundaries in determining that the question of whether a vessel is "subject to the jurisdiction of the United States" is not an essential element of § 70503(a)(1) for several reasons.

First, § 70504(a) is constitutional under the Supreme Court's teaching in McMillan. The Pennsylvania statute at issue there provided that anyone convicted of certain felonies was subject to a mandatory minimum sentence of five years' imprisonment if the sentencing judge (and not the jury) found, by a preponderance of the evidence, that the person visibly possessed a firearm while committing the offense. McMillan, 477 U.S. at 81. The Supreme Court upheld this allocation of functions on the basis of several factors, see id. at 86-90, noting that it was unable "to lay down any 'bright line' test" but concluding that Pennsylvania's Mandatory Minimum Sentencing Act "falls on the permissible side of the constitutional line," id. at 91. The Court did point out that the statute did not create any presumption against the defendant's innocence, that the finding of visible possession did not increase the penalty to which the defendant was subject but rather cabined

---

[12]  Apprendi does not govern § 70504(a) because this provision does not increase the statutory penalty but rather serves as a prerequisite for guilt.

-38-

the court's discretion within the statutory range, and that Pennsylvania did not appear to be restructuring an existing crime in order to evade the constitutional requirement of proof beyond reasonable doubt.[13]  Id. at 86-90.  All of these considerations apply equally to Congress's decision that the "subject to jurisdiction" issue is not an element of § 70503(a)(1) and may be decided by a judge: the presumption of a defendant's innocence is not affected; the underlying determination does not subject the defendant to an increased penalty; and there is no evidence that Congress was attempting to evade defendants' constitutional rights.[14]

Second, in determining whether legislatures have transgressed constitutional boundaries in defining elements of a crime, the Supreme Court has given great weight to the historic treatment of particular categories of facts.  This is true whether the allocation concerns sentencing, see, e.g., Harris v. United States, 536 U.S. 545, 560-61 (2002) (considering historical practice in determining that facts increasing a minimum sentence

---

[13]  The Court also noted that it was irrelevant that other state legislatures had treated visible possession as an element of various crimes.  McMillan, 477 U.S. at 90.

[14]  McMillan remains good law after the Supreme Court's holding in Apprendi.  Apprendi, 530 U.S. at 487 n.13; see also Harris v. United States, 536 U.S. 545, 563 (2002) ("Apprendi's conclusions do not undermine McMillan's.  There was no comparable historical practice of submitting facts increasing the mandatory minimum to the jury, so the Apprendi rule did not extend to those facts.").

-39-

need not be submitted to a jury), or the elements of a statutory crime, see, e.g., United States v. Gaudin, 515 U.S. 506, 515 (1995) ("We do not doubt that historical practice is relevant to what the Constitution means by such concepts as trial by jury . . . and it is precisely historical practice that we have relied on in concluding that the jury must find all the elements.").

Under historical practice the determination of whether a vessel is subject to the jurisdiction of the United States would not be an essential element of the offense. At common law, the elements of an offense included "each part of the actus reus, causation, and the mens rea" that the government needed to establish in order to obtain a conviction. Tinoco, 304 F.3d at 1108 (citing Black's Law Dictionary 520 (6th ed. 1990)). Section 70503(a)(1) criminalizes the knowing or intentional manufacture, distribution, or possession with intent to distribute a controlled substance on board a vessel. Whether a vessel was subject to the jurisdiction of the United States has no bearing on whether defendants manufactured, distributed, or possessed with intent to distribute a controlled substance or whether they did so knowingly or intentionally. The question of whether a vessel is subject to the jurisdiction of the United States thus does not relate to whether a defendant committed the proscribed actus reus or possessed the necessary mens rea. As such it does not meet the common law definition of an element.

The Supreme Court's decision in <u>Ford</u> v. <u>United States</u>, 273 U.S. 593 (1927), provides strong historical support that the question of whether a vessel is subject to the jurisdiction of the United States is not an element of a crime involving a vessel. In <u>Ford</u>, the defendants were charged with a Prohibition-era conspiracy to transport liquor into the United States in violation of a treaty between the United States and Great Britain. <u>Id.</u> at 600. The Supreme Court held that whether the vessel was seized within the zone covered by the treaty and therefore subject to the jurisdiction of the United States was not an issue a jury needed to decide: "The issue whether the ship was seized within the prescribed limit did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial." <u>Id.</u> at 606.

Third, the argument that this "subject to jurisdiction" question is not an element of the § 70305(a)(1) crime is strengthened by the fact that Congress did not need to include a provision in the MDLEA that the vessel be subject to the jurisdiction of the United States. Under the "protective principle" of international law, Congress can punish crimes committed on the high seas regardless of whether a vessel is subject to the jurisdiction of the United States. Under the protective principle, "[a] state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its

-41-

territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems." United States v. González, 776 F.2d 931, 940 n.11 (11th Cir. 1985) (quoting Restatement (Second) of Foreign Relations Law of the United States § 33(1)) (internal quotation marks omitted); see also Restatement (Third) of Foreign Relations Law § 402 & cmt. f (restating protective principle). In United States v. Cardales, 168 F.3d 548 (1st Cir. 1999), this court noted that "application of the MDLEA to the defendants is consistent with the protective principle of international law because Congress has determined that all drug trafficking aboard vessels threatens our nation's security." Id. at 553; accord United States v. González, 311 F.3d 440, 446 (1st Cir. 2002) (Torruella, J., concurring in the judgment) (because the protective principle applies, "the MDLEA does not require a jurisdictional statement to place it within Congress's regulatory power. The jurisdictional statement of the MDLEA is therefore not an essential element of the crime, as it may be in other statutes that lack outside authority."). If the statute need not have had a "subject to jurisdiction" component at all, that component is not an essential element of the crime unless Congress so intends.

In fact, there is a ready explanation for the presence of the "subject to jurisdiction" provision in the statute, an

-42-

explanation which reinforces the conclusion that the finding as to jurisdiction is not an element of the crime. Congress inserted the requirement that a vessel be subject to the jurisdiction of the United States into the statute as a matter of diplomatic comity. See Tinoco, 304 F.3d at 1108 ("[T]he jurisdictional requirement was inserted into the statute as a diplomatic courtesy to foreign nations and as a matter of international comity . . . ."). To put the concept in different terms, "It is misleading . . . to consider [a foreign nation's] consent an element of the offense; rather, it is a diplomatic requisite illustrating the international partnership that ensures the rule of law on the high seas." González, 776 F.2d at 940 (emphasis omitted).

We acknowledge that one circuit has decided the question differently. The Ninth Circuit held in Perlaza that § 70504(a)'s allocation of the jurisdictional issue to the judge is unconstitutional based on two primary rationales. First, the court reasoned that because many courts had thought, before the congressional clarification in 1996, that a jury was required to determine the jurisdiction question, Congress could not alter that arrangement. Perlaza, 439 F.3d at 1167. Second, Perlaza reasoned that because the jurisdictional inquiry involves factual questions, that meant it had to be an element of the crime. Id. We disagree on both points. Congress ordinarily defines crimes and can alter statutes to clarify or overrule judicial opinions. See, e.g.,

<u>Cleveland</u> v. <u>United States</u>, 531 U.S. 12, 19-20 (2000) (describing how Congress amended the federal mail fraud statute to expand the coverage given to it by the Court). A congressional decision on how to define elements of a crime is usually dispositive. <u>See</u> <u>Staples</u>, 511 U.S. at 604-05. Judicial interpretations given to allocations of functions between judge and jury under one version of a statute do not determine the constitutionality of a later, revised version in which Congress has made a different allocation. Moreover, as to the second rationale, it is well established that juries need not decide all questions with factual components. For example, the admissibility of evidence and the legality of searches and seizures are committed to judges. <u>See</u>, <u>e.g.</u>, <u>Gaudin</u>, 515 U.S. at 525-26 (Rehnquist, C.J., concurring).

Judge Torruella is of the view the question should be avoided, citing the doctrine of constitutional avoidance. The doctrine of constitutional avoidance is no bar to reaching the question of the constitutionality of § 70504(a) in this case. The Supreme Court has not treated constitutional avoidance as a strict rule but rather as a prudential consideration that judges should take into account on a case-by-case basis. <u>Rescue Army</u> v. <u>Mun. Court of Los Angeles</u>, 331 U.S. 549, 574 (1947); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Zobrest</u> v. <u>Catalina Foothills Sch. Dist.</u>, 509 U.S. 1, 7-8 (1993) (majority reaches constitutional issue over the dissent's constitutional avoidance argument). In particular, the Supreme

Court has departed from the doctrine in the contexts of harmless error analysis, see, e.g., Pope v. Illinois, 481 U.S. 497, 501-04 (1987), and the good-faith exception to the exclusionary rule, see, e.g., United States v. Leon, 468 U.S. 897, 925 (1984). And, in the qualified immunity context, the Court has told lower courts to reach constitutional issues in order to provide guidance on constitutional issues. See Saucier v. Katz, 533 U.S. 194, 201 (2001); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) ("[I]f the policy of avoidance were always followed . . ., standards of official conduct would tend to remain uncertain, to the detriment of both officials and individuals."); see also Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1277 (2006) (noting tension between the Saucier rule and the doctrine of constitutional avoidance).

The constitutionality of 46 U.S.C. § 70504(a) is a recurring issue which this court has avoided reaching before. See, e.g., United States v. Gil-Carmona, 497 F.3d 52, 54 (1st Cir. 2007); see also González, 311 F.3d at 443 (holding that defendant waived this argument by pleading guilty). The avoidance doctrine, of course, is not meant to thwart the even more fundamental doctrine governing all judges that the view of the majority is the holding of the court. We think it is important to resolve the question now in order to provide clear guidance to the district judges of this circuit and to litigants on how to handle this

issue.  <u>Cf.</u> <u>Leon</u>, 468 U.S. at 925 ("If the resolution of a particular Fourth Amendment question is necessary to guide future action . . ., nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue.").  The question is clearly raised in this case.  We do not think the issue is particularly difficult and so there is no reason to avoid the question because it is hard or close.  Indeed, the outcome is mandated by Supreme Court precedent.

We hold that § 70504(a) is constitutional and dispose of the plain error inquiry at the first step.  We otherwise join in Judge Torruella's opinion.