# United States Court of Appeals
## For the First Circuit

Nos. 08-2289, 08-2290, 08-2291

UNITED STATES OF AMERICA,

Appellee,

v.

EPIFANIO MATOS-LUCHI, MANOLO SOTO-PÉREZ,
RAMÓN CARRASCO-CARRASCO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Ricardo R. Morel for appellants.
David E. Hollar, Criminal Division, Appellate Section, Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Gary G. Grindler, Deputy Assistant Attorney General, Rosa E. Rodríguez-Vélez, United States Attorney, and Nelson J. Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee.

December 1, 2010

**BOUDIN, <u>Circuit Judge</u>**.  This appeal by several defendants convicted of drug trafficking--Epifanio Matos-Luchi, Manolo Soto-Perez, and Ramon Carrasco-Carrasco--requires the interpretation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501 <u>et seq.</u> (2006), which <u>inter alia</u> delineates federal enforcement authority over drug crimes carried on at sea outside U.S. territorial limits.  The factual background and proceedings in the district court are as follows.

In May 2007, Petty Officer Richard Young and a team of five other U.S. Coast Guard personnel were stationed on the HMS <u>Ocean</u>, a British aircraft carrier, to assist with law enforcement efforts in the Carribean Sea.  On May 12, the Coast Guard team deployed in a helicopter to investigate a low-flying airplane spotted in the vicinity; from the air, they saw the plane drop several bale-shaped packages into the sea about thirty to thirty-five miles from the coast of the Dominican Republic.[1]

A small boat waiting nearby--a twenty to twenty-five foot fishing "yola" propelled by an outboard motor and allegedly crewed by the three defendants--then approached the drop site and began to retrieve the bales.  The officers suspected drug trafficking and descended in the helicopter.  The boat crew jettisoned the bales and

---

[1]The area is outside Dominican territorial waters and considered the "high seas" for purposes of the Coast Guard's enforcement jurisdiction, 14 U.S.C. § 89(a) (2006); 33 C.F.R. § 2.32(c) (2009), although within the Dominican Republic's exclusive economic zone, <u>id.</u> § 2.30(b).

fled.    After giving chase for nearly an hour, the Coast Guard helicopter returned to the drop site to retrieve the bales, which proved to contain packages of cocaine.

While the helicopter retrieved the drugs, a U.S. Customs and Border Protection airplane followed the yola as it proceeded north towards the Dominican Republic.  The boat experienced engine problems and halted about twenty-five miles from the Dominican coast.  At the request of the U.S. Customs officials, a Dominican Coast Guard cutter sailed out to retrieve the yola and its crew.  The three crew members were taken on board the cutter and the yola was tied to its stern.

Later that evening, Young and two others traveled from the HMS Ocean to the Dominican cutter where, with the permission of the Dominican authorities, they questioned the three defendants who now were on board the cutter.  Young later testified that when questioned, Matos, Soto and Carrasco declined to make a claim of nationality for the yola:

> I asked . . . who was the captain of the vessel they were on or the senior person in charge of the boat, and they responded there was no single person in charge.  Since I could not determine if there was a captain of the vessel, I asked if anybody would like to speak for the boat and give me a claim of nationality.  And they shook their heads no, and actually did not give me a full response.  Because I could not get one individual to make a claim for the vessel, I then questioned what was the nationality of the personnel.  And they had all told me and informed me that they were from the Dominican Republic.  I asked if

-3-

the boat had come from the Dominican Republic as well, and they, in turn, agreed.

While Young interrogated the yola crew, another Coast Guard officer boarded the yola, now tied to the stern of the cutter. No ensign, flag, registration, or other evidence of the vessel's nationality was found on board. The U.S. Coast Guard crew were instructed by their superiors to detain the defendants, who were transferred to the HMS <u>Ocean</u> and then brought to Puerto Rico for prosecution in federal district court.

The defendants were charged by indictment with violations of the MDLEA: one count of possessing cocaine with the intent to distribute, 46 U.S.C. § 70503, and one count of aiding and abetting that crime, 18 U.S.C. § 2 (2006), all while on board a "vessel without nationality" and so within the enforcement authority of the United States, 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1). The defendants moved to dismiss the indictment "for lack of jurisdiction," arguing that there was no proof that they were on board a "vessel without nationality" as alleged in the indictment. The district court held that motion in abeyance, and the defendants proceeded to trial.

When the government rested its case in chief, the defendants sought a judgment of acquittal from the court, repeating that there was no proof that they were on board a "vessel without nationality." The court denied the motion. The most extensive explanation given by the judge, provided in response to defense

-4-

counsel's repeated efforts to have the jury instructed on the issue, was as follows:

> Title [46], the law defines a vessel without nationality. And look at this. A vessel on which the master or individual in charge--you need a master or individual in charge, to begin with--fails on request of an officer of the United States, authorized to enforce applicable United States law, to make a claim of nationality or registry for that vessel.
> . . . .
> And then what happens on top of that, you have a vessel that is in international waters, no written registration on the outside. No name, no flying flag, no nothing.
> . . . .
> I believe it is entirely up to me to make a determination as to jurisdiction, and I'm convinced that there is jurisdiction, so I cannot ask the jury to make that determination.

Ultimately, the jury found the defendants guilty as charged of possession with intent to distribute the seized drugs. Conformably with the statute, the issue of whether the vessel was without nationality was not submitted to the jury. See 46 U.S.C. § 70504(a). Based on the weight of the cocaine recovered--which was 386 kilograms--the defendants were later each sentenced to 235 months' imprisonment. This appeal followed.

The most abstruse issue in the case, with which we begin, is whether the defendants' possession of the cocaine with intent to distribute occurred on board "a vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1). To put the issue in context requires an understanding of the design and background the

-5-

MDLEA--a statute initially enacted in 1986 as 46 U.S.C. app. § 1903, see Pub. L. No. 99-570, § 3202, 100 Stat. 3207, 3207-95 to -97 (1986), and later relocated to its present code sections, 46 U.S.C. §§ 70501-70507, see Pub. L. No. 109-304, § 10(2), 120 Stat. 1485, 1685-89 (2006).

Invoking its constitutional power "[t]o define and punish Piracies and Felonies committed on the high Seas," U.S. Const. art. I, § 8, cl. 10, Congress in the MDLEA made it unlawful inter alia for anyone to

> knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board . . . a vessel subject to the jurisdiction of the United States . . . even though the act is committed outside the territorial jurisdiction of the United States.

46 U.S.C. § 70503(a)-(b).[2]

Underscoring its aim to reach broadly, Congress defined "a vessel subject to the jurisdiction of the United States" to include six categories of boats (listed in full in an appendix to this decision)--first among them "a vessel without nationality," 46 U.S.C. § 70502(c)(1)(A).

In turn, "a vessel without nationality" is defined to "include[]" the following:

---

[2]The same prohibition applies to such conduct by anyone onboard "a vessel of the United States," id. § 70503(a)(1), or "any vessel if the individual is a citizen of the United States or a resident alien of the United States," id. § 70503(a)(2); but neither of these conditions was satisfied in this case.

-6-

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
> (C) a vessel aboard which the master or individual in charge makes a claim of registry for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

That the listed examples do not exhaust the scope of section 70502(d) is confirmed by Congress' contrasting use of the phrase "includes only" in a related provision,[3] by its evident and explicit attempts to sweep quite broadly, see, e.g., S. Rep. 99-530, at 15-16 (1986), and by relevant precedent, United States v. Rosero, 42 F.3d 166, 170 (3d Cir. 1994) (Alito, J.). At the very least, Congress intended to include in section 70502(d), in addition to the specific examples given, those vessels that could be considered

---

[3]The term "claim of nationality or registry" in subsection (d) is defined in subsection (e) such that it

> includes only--
> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
> (2) flying its nation's ensign or flag; or
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e).

-7-

stateless under customary international law.  Id. at 170-71; see also H.R. Rep. No. 96-323, at 23-24 (1979) (discussing predecessor statute).

Congress' intent to reach broadly was reconfirmed in the Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 1138, 110 Stat. 3901, 3988-89, which amended the MDLEA by providing that the "jurisdiction" of the United States over a vessel under the MDLEA was "not an element of the offense" but a matter to be determined "solely by the trial judge," id. § 1138(a)(5) (now codified at 46 U.S.C. § 70504(a)), and that a defendant had no standing to claim that enforcement violated "international law"--reserving such objections only to foreign nations, id. § 1138(a)(4) (now codified at 46 U.S.C. § 70505).[4]

Against this background, the district court's determination that the defendants' yola was "a vessel without nationality" within the meaning of the MDLEA was correct.  This is so regardless of whether that finding is to be made by a preponderance of the evidence--as one of our earlier decisions implies, Vilches-Navarrete, 523 F.3d at 20 (separate opinion of Lynch & Howard, JJ.)--

---

[4]"Jurisdiction" in this context refers to the enforcement reach of the statute--not federal court subject-matter jurisdiction, which extends to any federal felony.  United States v. González, 311 F.3d 440, 443 (1st Cir. 2002), cert. denied, 540 U.S. 826 (2003).  That reach was limited by Congress to minimize conflict with foreign nations who might also assert rights to regulate.  See United States v. Vilches-Navarrete, 523 F.3d 1, 22 (1st Cir.) (separate opinion of Lynch & Howard, JJ.), cert. denied, 129 S. Ct. 208 (2008).

or beyond a reasonable doubt.  Indeed, virtually none of the raw facts bearing on the reach of the statute is disputed; the problem is primarily one of interpreting the statute.

Still, the burden of proof question is likely to be a recurring one for district courts within the circuit.  In our view, Congress intended it to be a preliminary issue, like venue and other judge-determined issues, to be proven by a preponderance of the evidence.  In González, 311 F.3d at 443, we likened U.S. jurisdiction over a vessel to statutory language that signals Congress' invocation of its own authority, like "affects interstate commerce"; but unlike other such "jurisdictional hooks" decided by a jury beyond a reasonable doubt, the reach of the statute in this case is not an element of the offense, 46 U.S.C. § 70504(a).

Our reading--requiring proof only to a preponderance--is common to many judge-determined issues, e.g., United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008) (consent to search); United States v. Schussel, 291 F. App'x 336, 343 (1st Cir. 2008) (unpublished) (existence of privilege); United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir.) (voluntariness of confession), cert. denied, 549 U.S. 905 (2006); United States v. Garza, 435 F.3d 73, 77 (1st Cir.) (admissibility of evidence), cert. denied, 547 U.S. 1158 (2006); United States v. Wiggin, 429 F.3d 31, 36-37 (1st Cir. 2005) (competency to stand trial); United States v. Cordero, 668 F.2d 32, 44 n.18 (1st Cir. 1981) (propriety of venue), and it here comports

with Congress' aim to facilitate enforcement.  Defendants raise no
constitutional objection on this issue, and we see none.[5]

Turning now to the issue of the yola as a stateless
vessel, viewed in part retrospectively, the boat had various links to
the Dominican Republic.  The crew members were Dominicans and the
small vessel was likely headed there before its engine troubles and
subsequent interception by the Dominican Coast Guard.  At trial one
defendant said that the vessel was registered there in some fashion.
But neither the MDLEA nor international law limits U.S. enforcement
authority merely because the vessel has associations with another
state.

Under international law, every vessel must sail under the
flag of one and only one state; those that sail under no flag or more
than one flag enjoy no legal protection.  1 L. Oppenheim,
International Law § 261, at 595-96 (H. Lauterpacht ed., 8th ed.
1955); see also Convention on the High Seas art. 6, Apr. 29, 1958, 13
U.S.T. 2312, 450 U.N.T.S. 82; United States v. Victoria, 876 F.2d
1009, 1010-11 (1st Cir. 1989).  By custom, a vessel claims
nationality by flying the flag of the nation with which it is

---

[5]See Vilches-Navarrete, 523 F.3d at 20-22 (separate opinion of
Lynch & Howard, JJ.) (holding it constitutional for Congress to
allocate jurisdiction question to the judge); accord United States v.
Tinoco 304 F.3d 1088, 1111 (11th Cir. 2002), cert. denied, 538 U.S.
909 (2003).  But see United States v. Perlaza, 439 F.3d 1149, 1167
(9th Cir. 2006).  In criminal cases, jury fact-finding and the
beyond-reasonable-doubt standard generally go hand in hand.  Sullivan
v. Louisiana, 508 U.S. 275, 278 (1993).

affiliated or carrying papers showing it to be registered with that nation. 1 Oppenheim, supra, §§ 260-261, at 594-96. Without a flag or papers, a vessel may also traditionally make an oral claim of nationality when a proper demand is made--a pattern the MDLEA follows. See supra note 3 (quoting 46 U.S.C. § 70502(e)).[6]

Although enforcement jurisdiction presumptively lies with the flag state, 1 Oppenheim, supra, § 266, at 603, "[i]t is not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it." Anderson, supra note 6, at 341. Anderson, id. at 336-37, pertinently quotes a Privy Council judgment:

> [T]he freedom of the open sea, whatever those words may connote, is a freedom of ships which fly, and are entitled to fly, the flag of a State . . . . Their Lordships would accept as a valid statement of international law, the following passage from Oppenheim's International Law . . . : "In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever . . . ."

Molvan v. Att'y-Gen. for Palestine, [1948] A.C. 351 (P.C.) 369-70; see also 1 Oppenheim, supra, § 261, at 595.

The MDLEA follows this approach, one might say, energetically. Section 70502(d) "includes" in the phrase "vessel

---

[6]See also Anderson, Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 341 (1982). On the traditional right to approach a suspect vessel to verify its nationality, see 1 Oppenheim, supra, § 266, at 604.

-11-

without nationality" those ships for which a claim of nationality is made but rejected or not backed up by the nation invoked, 46 U.S.C. § 70502(d)(1)(A), (C), or those "aboard which the master of individual in charge" fails on request "to make a claim of nationality or registration" for the vessel, id. § 70502(d)(1)(B). In our case, the defendants when questioned by the U.S. Coast Guard refused to make a claim of nationality for the yola.

That questioning was aboard the Dominican cutter rather than the defendants' yola and so arguably does not fit within the language of section 70502(d)(1)(B)--at least if "aboard" is given its common meaning of "on board."[7]  But neither "aboard" the yola, nor adjacent to it on the cutter, did any crew member make an affirmative claim of nationality for the vessel, nor did the yola fly a flag or carry registry papers issued by any state.  Under both the statute and international law, this is more than enough to "include" the yola as a vessel "without nationality" within the meaning of the MDLEA even if it is merely similar to and not within one of the specific examples given in the statute.

Practically every vessel, including the legendary Flying Dutchman, has links with some country; but the stateless vessel

---

[7]The word can also mean "alongside of," especially in nautical contexts, and the defendants were arguably alongside of the yola when they declined to make a claim of nationality.  See Webster's Third New International Dictionary of the English Language 4 (2002); The Random House Dictionary of the English Language 5 (2d ed. unabr. 1987).

concept in the MDLEA and in international law is designed prudentially. The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality. To read the MDLEA more restrictively would mean that the master and crew need only carry no papers and jump overboard to avoid having their vessel classed as stateless. Cf. González, 311 F.3d at 449 (Torruella, J., concurring in the judgment).

The defendants are not entitled to raise a violation of international law as an objection, see 46 U.S.C. § 70505, but in any case the MDLEA does not conflict with international law. For international law too treats the "stateless vessel" concept as informed by the need for effective enforcement. Thus, a vessel may be deemed "stateless," and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification. This occurs

> if a "ship" repeatedly refuses, without reasonable excuse, to reveal its allocation [of nationality]. If no registration number is visible and no other indicator [of nationality] can be discerned, the cognoscibility is already demonstrably insufficient, and interference will then often be justifiable. . . . From the basic design of [the law of sea] and from the place the institution here called allocation occupies in it already it may be concluded that a "ship" which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may be treated as stateless.

-13-

H. Meyers, The Nationality of Ships 322 (1967)(footnote omitted).

In sum, the instances specified by Congress--pertinently, the refusal "aboard" the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B)--are not departures from international law but merely part of a pattern consistent with it; and when Congress used the word "includes" in listing specific instances, it allowed for reasonable extrapolation to functionally similar instances--including a refusal by the crew to claim nationality that happens to occur aboard a cutter which has the subject "vessel" in tow.

The MDLEA was responding to repeatedly frustrated efforts to prosecute maritime drug trafficking. Anderson, supra note 6, at 325-27 (describing enforcement history). The statute's provisions dovetail: a refusal to claim nationality renders the unflagged vessel stateless and so within federal jurisdiction, while a supportable claim of nationality allows the federal authorities to seek jurisdiction by consent of the flag nation, e.g., 46 U.S.C. § 70502(c)(1)(C). Congress did not expect courts to render a cramped reading of the statute.

Accordingly, we need not decide whether (in the alternative) the transfer of the crew by the Dominican Coast Guard constituted "consent" by the Dominican Republic to federal enforcement. Consent would satisfy the MDLEA, 46 U.S.C. § 70502(c)(1)(C) (consent of flag state); id. § 70502(c)(1)(E) (consent of state in whose territorial waters vessel is found), and accord

-14-

with international law, United States v. Robinson, 843 F.2d 1, 4 (1st Cir.), cert. denied, 488 U.S. 834 (1988). Whether such informal consent is enough may be an open question. See id.

Matos, Soto and Carrasco also raise a host of other claims on appeal--all requiring less discussion than the authority question. Our decision has thus far assumed that--as the jury necessarily found--the defendants were the crew first sighted by the helicopter and seen to throw overboard bales that were recovered and found to contain cocaine. The defendants say that the evidence for this identification was insufficient.

The defendants stress that the Dominican cutter that retrieved them had already intercepted and detained a second yola, with a crew of two. The defendants argue that the government's evidence was insufficient to prove that they were on the yola seen gathering drugs rather than on this second, innocent yola, because Officer Young testified at trial that the three defendants "could be" the same three persons that he observed from his helicopter. The argument was preserved in a motion for acquittal, so our review is de novo. United States v. Potter, 463 F.3d 9, 13-14 (1st Cir. 2006).

Nevertheless, taking the evidence in the light most favorable to the government, a rational jury could easily have found the defendants guilty beyond a reasonable doubt. Although no single witness had a continuous view of the yola from the time the boat was first spotted until the moment it was apprehended by the Dominican

-15-

cutter, there was abundant evidence from which to identify the defendants as the crew-members and the evidence is not less powerful because some of it rested upon reasonable inference rather than eye-witness identification.  See United States v. Santana-Rosa, 132 F.3d 860, 866 (1st Cir. 1998).

The evidence at trial included testimony from Officer Young that the defendants' age and build matched the three persons observed on the yola; multiple videos and photos of the yola from which the jury could infer the same; ion scans of cocaine residue on the skin and clothing of the defendants;[8] and testimony from the lieutenant of the Dominican cutter than the two-man yola crew and three-man yola crew were segregated on his boat and thus unlikely to be mixed up.

The defendants also raise two other arguments under the heading of their identification challenge but which in truth present different legal questions.  First, they claim that the government denied them a fair trial by failing to produce the only witness allegedly in a position to settle the identification issue, a Dominican official named Carmelo Matos Rodriguez.  Government interference in the production of witnesses helpful to the defendant may in some circumstances preclude a fair trial, e.g., United States

---

[8]The defendants argue on appeal that ion scans are unreliable "[a]s a matter of law" and offend due process, but they provide no citation or developed argument, so the objection is waived.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).

-16-

v. Castro, 129 F.3d 226, 232 (1st Cir. 1997), cert. denied, 523 U.S. 1100 (1998), but nothing like that is evident in this case.

A trial subpoena was issued at defendants' request for Matos Rodriguez on March 27, 2008, and the government apparently attempted to secure his presence at trial. But the defendants incorrectly identified Matos Rodriguez as a member of the "Dominican Coast Guard" when he was in fact with the Dominican equivalent of the Drug Enforcement Agency. When the error was discovered and Matos Rodriguez located, there was insufficient time to get him the necessary documents to travel to the United States. The defendants never sought a continuance.

Defendants seem to claim, at least at oral argument, that they were affirmatively misled by the government into believing that Matos Rodriguez would appear--only to be told the contrary on the first day of trial. We ordered supplemental briefing from the defendants on this specific issue after argument, instructing them to "provide relevant transcript and record references." Instead, they submitted a brief that relies entirely on alleged pretrial conversations and affidavits from their own employees--none of which is part of the record on appeal. Fed. R. App. P. 10(a).

Second, defendants assail the instructions given to the jury on identification during deliberations, after the jury sent a note requesting clarification on the issue; they complain that the trial judge alluded to hypothetical testimony by a witness who looks

-17-

at a lineup and says "I think it's number two." Their position is that "I think" is too equivocal for proof beyond a reasonable doubt and that the instruction would have misled the jury into thinking that a doubtful identification was sufficient to convict.

No objection was made to the instruction at the time it was made, so it is reviewed only for plain error, United States v. Rogers, 41 F.3d 25, 30-31 (1st Cir. 1994), cert. denied, 515 U.S. 1126 (1995), but on reading the instruction ourselves, we see no error at all. The court correctly instructed the jury on the types of evidence it could consider and reminded the jury--at defense counsel's request--that identification had to be proven beyond a reasonable doubt. Nothing in the instructions suggested that a doubtful identification was sufficient.

Next, defendants argue that the evidence was insufficient as to mens rea; they claim that--even if they were the persons on board the yola observed retrieving the airdropped bales--there was insufficient evidence that they knew the bales contained contraband as opposed to innocent cargo. Again, the argument was preserved in a motion for acquittal, so our review is de novo, taking all facts and inferences in the light most favorable to the government. United States v. Guerrero, 114 F.3d 332, 339 (1st Cir.), cert. denied, 522 U.S. 870 (1997). But again the evidence here amply supports the verdict and is well within our precedents.

The defendants' yola was seen idling in the drop site before collecting the bales, cf. Guerrero, 114 F.3d at 343; the yola lacked fishing equipment, despite defendants' claim at trial to have been out fishing; the defendants jettisoned the bales and fled at the first sign of the Coast Guard, cf. United States v. Piedrahita-Santiago, 931 F.2d 127, 131 (1st Cir. 1991); and the defendants and their clothing showed traces of the drug. Nor is it common for valuable cargo to be entrusted to persons unaware of its contents. United States v. Angulo-Hernández, 565 F.3d 2, 8 (1st Cir.), cert. denied, 130 S. Ct. 776 (2009).

Finally, at sentencing, defendants sought a reduction in the calculation of their offense level because they were minor participants in the crime, U.S.S.G. § 3B1.2(b) (2008)--an argument rejected by the sentencing judge--as well as a reduction under United States v. Booker, 543 U.S. 220 (2005), and its progeny. They never clearly articulated then or now why a sentence within the guidelines range would be unreasonable or unjust (except that it was long); instead, they argue on appeal that the sentencing judge failed to understand his discretion to depart downwards under Booker.

At one point, the sentencing judge stated that "[t]here is nothing before the Court that would allow [it] to make any meaningful exercise of any additional sentencing factor under [18 U.S.C. §] 3553(a), because nothing of the sort has been argued." In context, we see no indication that the judge misunderstood his authority;

rather he simply thought that the defendants had offered no persuasive reason for a lower sentence.  The latter judgment was his to make.

Affirmed.

# APPENDIX

46 U.S.C. § 70502(c) (2006) states in full:

(c) Vessel subject to the jurisdiction of the United States.--
(1) In general.--In this chapter, the term "vessel subject to the jurisdiction of the United States" includes--
(A) a vessel without nationality;
(B) a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas;
(C) a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States;
(D) a vessel in the customs waters of the United States;
(E) a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States; and
(F) a vessel in the contiguous zone of the United States, as defined in Presidential Proclamation 7219 of September 2, 1999 (43 U.S.C. 1331 note), that--
(i) is entering the United States;
(ii) has departed the United States; or
(iii) is a hovering vessel as defined in section 401 of the Tariff Act of 1930 (19 U.S.C. 1401).
(2) Consent or waiver of objection.--Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under paragraph (1)(C) or (E)--
(A) may be obtained by radio, telephone, or similar oral or electronic means; and
(B) is proved conclusively by certification of the Secretary of State or the Secretary's designee.


**-Dissenting Opinion Follows-**

**LIPEZ, <u>Circuit Judge</u>, dissenting.** The Maritime Drug Law Enforcement Act (MDLEA) makes it unlawful for an individual to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board (1) a vessel of the United States or a vessel subject to the jurisdiction of the United States; or (2) any vessel if the individual is a citizen of the United States or a resident alien of the United States." 46 U.S.C. § 70503(a). The majority, after concluding that the government need only prove by a preponderance of the evidence that a vessel is "subject to the jurisdiction of the United States," holds that the government met its burden in this case because it established that the defendants' small fishing boat was a "vessel without nationality" within the meaning of the statute. <u>See</u> <u>id.</u> § 70502(c) (defining "vessel subject to the jurisdiction of the United States" to include "a vessel without nationality"). I disagree with both of those conclusions. Therefore, I respectfully dissent.

## I.

The MDLEA was one of a series of steps Congress took in the 1980s and 1990s to extend the reach of the federal drug laws beyond the territory of the United States. Because the function and meaning of the critical phrase "subject to the jurisdiction of the United States" is not self-evident, it is important to understand the MDLEA's design and background. I therefore begin by reviewing the

-22-

legislative context giving rise to the statute and its jurisdictional requirement.

## A. Marijuana on the High Seas Act

Before 1980, maritime drug smugglers outside the territorial waters of the United States generally had to be prosecuted for conspiracy to import drugs into the United States. That regime proved to be unsatisfactory, primarily because of the difficulty of proving an intent to import. The problem was not that the Coast Guard lacked the authority to interdict drug smugglers and seize contraband; to the contrary, the Coast Guard has long enjoyed "'one of the most sweeping grants of police authority ever to be written into U.S. law.'" Note, High on the Seas: Drug Smuggling, the Fourth Amendment, and Warrantless Searches at Sea, 93 Harv. L. Rev. 725, 726 (1980) (quoting Stephen H. Evans, The United States Coast Guard 1790-1915 218 (1949)); see 14 U.S.C. § 89(a) (setting forth Coast Guard's enforcement authority). Rather, the problem derived from the limited substantive scope of the maritime drug laws: "in most cases the Coast Guard [was] able to seize and confiscate the ship and the illegal drugs, but the government [was] not able to prosecute the crew or others involved in the smuggling operation." S. Rep. No. 96-855, at 2 (1980).

Congress responded to the problem by enacting the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat. 1159 (1980), which broadened the drug laws in a number of ways. Most

-23-

importantly, the statute made it a crime for certain individuals on the high seas to possess drugs with the intent to distribute, which obviated the need to prove that the drugs were destined for the United States and opened the door for a much broader extraterritorial application of the federal drug laws. See 125 Cong. Rec. 20,083 (1979) (statement of Rep. Paul McCloskey) ("Where current law requires an intent to import a controlled substance into the United States as a necessary element of the crime[,] this bill essentially requires only knowledge or intent to distribute with no need to establish a U.S. destination. Such intent may be inferred from the presence of controlled substances that exceed normal consumption -- and that are not entered as cargo on a vessel's manifest.").

The majority is correct that the Marijuana on the High Seas Act and its successor statutes manifest an intent to reach broadly. Congress was concerned about maritime drug trafficking and sought to "give the Justice Department the maximum prosecutorial authority permitted under international law." S. Rep. 96-855, at 2; see also 125 Cong. Rec. 20,083 (1979) (statement of Rep. Paul McCloskey) (stating that the bill authorizes prosecution "to the broadest extent possible under international law"). As the quoted legislative history makes clear, however, Congress also intended to stay within the boundaries of international law, which places limitations on a nation's power "to make its law applicable to the activities, relations, or status of persons." Restatement (Third) of

-24-

Foreign Relations Law of the United States § 401(a) (1987). Those limitations, referred to under the heading "jurisdiction to prescribe," have traditionally permitted nations to legislate with respect to (1) their own nationals; (2) acts committed within, or having substantial effects within, their territory; and (3) acts directed at their national security.[9] Id. § 402.

On the high seas, there is an additional basis of jurisdiction to prescribe: vessel nationality.[10] Vessels, like people, are capable of having nationality, and a vessel on the high seas (and those aboard it) may be subjected to the laws of the country whose nationality she bears. See id. § 502(2). A Canadian vessel, for example, may properly be subjected to the laws of Canada. The high seas legal regime depends upon vessels having one, and only one, nationality. Vessels without any nationality at all (also referred to as stateless vessels) are subject to the prescriptive jurisdiction

_____

[9] Nations may also prescribe law with respect to a narrow class of universally condemned activities, such as piracy. Restatement (Third) § 404.

[10] A number of sources say that vessel nationality provides the exclusive basis for exercising prescriptive jurisdiction over a vessel on the high seas. See Convention on the High Seas art. 6, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82; McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 21 (1963); R.R. Churchill & A.V. Lowe, The Law of the Sea 208 (3d ed. 1999). However, Congress, in enacting the Marijuana on the High Seas Act, apparently viewed vessel nationality as a supplement to the traditional bases of prescriptive jurisdiction. The Restatement concurs in that view. See Restatement (Third) § 402 reporters' note 4 (characterizing vessel nationality as "an addition to the general bases of jurisdiction set forth in this section").

of every nation.  See United States v. Victoria, 876 F.2d 1009, 1010-11 (1st Cir. 1989); United States v. Marino-Garcia, 679 F.2d 1373, 1380-83 (11th Cir. 1982).

Although the settled bases of prescriptive jurisdiction are broad, they are not limitless.  A country must be able to point to one of those bases when extending its penal laws to an individual. If Congress had made it a federal crime for any person to possess drugs on board any vessel anywhere, it would have run afoul of the international legal limitations on its jurisdiction to prescribe.[11] Congress therefore limited the reach of the Marijuana on the High Seas Act to five categories of persons: (1) United States citizens, (2) individuals on board a vessel within the customs waters of the United States, (3) individuals intending to import drugs into United States territory or who know drugs will be imported into the United States, (4) individuals on board a vessel with United States nationality, and (5) individuals on board a  U.S. vessel or a "vessel subject to the jurisdiction of the United States on the high seas," which was defined to include a "vessel without nationality or a vessel assimilated to a vessel without nationality."  Pub. L. No. 96-350, 94

---

[11] Although Congress could enact criminal laws that go beyond the limitations of international law, see, e.g., Curtis A. Bradley, Universal Jurisdiction and U.S. Law, 2001 U. Chi. Legal F. 323, 331 (2001), its intention at the time, as indicated above, apparently was to stay within those limits.  Cf. United States v. Hensel, 699 F.2d 18, 27 (1st Cir. 1983) ("Congress wished to authorize the search of vessels on the high seas to the extent such searches conformed to international law, but there is no indication that it wished to go further.").

Stat. 1159.  Each of those categories corresponds to one of the traditional bases for exercising prescriptive jurisdiction -- nationality of the defendant, territoriality, national security, nationality of the vessel, and statelessness.  See H.R. Rep. No. 96-323, at 10-11 (1979).  The point made explicit in the legislative history is thus apparent from the text of the statute as well: Congress intended to extend the maritime drug laws to what it viewed as the limits provided by international law, but no further.[12]

## B.  Maritime Drug Law Enforcement Act

By 1986, Congress had become convinced that the Marijuana on the High Seas Act was in need of revision.  In Congress's view, "defendants in cases involving foreign or stateless vessel boardings and seizures [had] been relying heavily on international jurisdictional questions as legal technicalities to escape conviction."  S. Rep. No. 99-530, at 15 (1986).  Congress enacted the Maritime Drug Law Enforcement Act, Pub. L. 99-640, § 17, 100 Stat. 3545 (1986), with a view toward further expanding and strengthening the maritime drug laws.  Its approach was measured, however.  Although Congress extended the statute's coverage to several new categories of defendants -- most notably, to individuals on board "a vessel registered in a foreign nation where the flag nation has consented or

[12]     Other statutes criminalizing extraterritorial conduct have followed a similar approach.  See, e.g., 18 U.S.C. § 2237 (failure to heave to, obstruction of boarding, providing false information); id. § 2339B (providing material support to designated foreign terrorist organizations); id. § 2339C (financing terrorism).

waived objection to the enforcement of United States law by the United States"[13] -- it otherwise retained the pre-existing restrictions on the statute's substantive scope.  Id.  Congress also added a provision partially defining the phrase "vessel without nationality," which had been left undefined in the original statute.[14]

## C.  1996 Amendments

Congress amended the MDLEA again in 1996.  See Coast Guard Authorization Act of 1996, Pub. L. No. 104-324, § 1138, 110 Stat. 3901, 3988-89 (1996).  The intent, as before, was to "expand the Government's prosecutorial effectiveness in drug smuggling cases." H.R. Rep. No. 104-854, at 142 (1996) (Conf. Rep.).  To that end, Congress further expanded the definition of "vessel without nationality,"  Pub. L. No. 104-324, § 1138(a)(1),[15] added provisions

---

[13]   Consent is a well-established basis of jurisdiction to prescribe under international law.  See United States v. Robinson, 843 F.2d 1, 4 (1st Cir. 1988).

[14] The statute provided that a "vessel without nationality" includes:

(A) a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed; and
(B) any vessel aboard which the master or person in charge fails, upon request of an officer of the United States empowered to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel.

Pub. L. No. 99-640, 100 Stat. 3545.

[15] The new provision added to the definition "a vessel aboard which the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and

-28-

making it easier for the government to prove that a foreign nation consented to the prosecution, id. § 1138(a)(2)-(3), and declared that MDLEA defendants "shall not have standing to raise the claim of failure to comply with international law as a basis for a defense," id. § 1138(a)(4). Congress also enacted an unusual provision that has assumed importance in this case:

> Jurisdiction of the United States with respect to vessels subject to this chapter is not an element of any offense. All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.

Id. § 1138(a)(5). Otherwise, the amendments left the substantive limitations on the MDLEA's scope unaltered.

With this background in mind, I turn to the majority's analysis.

## II.

The majority holds, as a threshold matter, that the government's proof that the defendants' vessel is covered by the MDLEA must be by a preponderance of the evidence rather than beyond a reasonable doubt. I do not agree. Like the majority, I do not believe the burden of proof affects the outcome of this case. Nevertheless, I wish to respond to the majority's analysis.

Prior to the 1996 amendments to the MDLEA, vessel status had to be proved to the jury beyond a reasonable doubt. See, e.g.,

---

unequivocally assert that the vessel is of its nationality."

United States v. Guerrero, 114 F.3d 332, 339 (1st Cir. 1997).[16]  The 1996 amendments expressly removed the vessel status issue from the jury's consideration.  See 46 U.S.C. § 70504(a).  They did not address the standard of proof, however.  I would presume, in the absence of any textual indication to the contrary, that Congress did not intend to silently alter the longstanding rule that vessel status must be proved beyond a reasonable doubt.  See United States v. O'Brien, 130 S. Ct. 2169, 2178 (2010) ("Congress does not enact substantive changes sub silentio.").

The majority offers several justifications for reading an implied shift in the standard of proof into the 1996 amendments. First, it says that Congress intended vessel status to be "a preliminary issue, like venue and other judge-determined issues" that are commonly proved by a preponderance of the evidence.  See 46 U.S.C. § 70504(a) (characterizing "[j]urisdiction," i.e., vessel status, as a "preliminary question[] of law").  But that rationale is in conflict with our decision in United States v. González, 311 F.3d 440 (1st Cir. 2002), where we held that vessel status goes to "the substantive reach of the statute – applying to some vessels but not others" – rather

---

[16]    Our court was not alone in that interpretation.  "Prior to 1996, there was a consensus among the circuits that 'the jurisdictional requirement . . . is an element of the crime charged and therefore must be decided by the jury.'"  United States v. Moreno-Morillo, 334 F.3d 819, 828 (9th Cir. 2003) (quoting United States v. Medjuck, 48 F.3d 1107, 1110 (9th Cir. 1995)); see also United States v. Bustos-Useche, 273 F.3d 622, 626 (5th Cir. 2001); United States v. Medina, 90 F.3d 459, 464 (11th Cir. 1996).

than to the threshold issue of the court's authority to hear the case. Id. at 443 (emphasis omitted). Unlike venue and the other procedural and evidentiary matters mentioned by the majority, a failure to prove that defendants' conduct occurred on board a covered vessel amounts to a failure to prove that the defendants violated the MDLEA. Compare id. ("Congress asserted its own authority to regulate drug trafficking on some ships but not all ships and, in this context, used the word 'jurisdiction' loosely to describe its own assertion of authority to regulate; it does the same thing whenever it fixes an 'affects interstate commerce' or 'involved a federally insured bank' as a condition of the crime."), with Am. Dredging Co. v. Miller, 510 U.S. 443, 453 (1994) ("[V]enue is a matter that goes to process rather than substantive rights – determining which among various competent courts will decide the case.").[17]

It is equally unhelpful to suggest, as the majority does, that Congress's allocation of decision-making authority to the judge necessarily implies a shift in the standard of proof because "jury fact-finding and the beyond-a-reasonable-doubt standard generally go hand in hand." Although the two issues often go hand in hand, they are not invariably linked. Venue, for instance, is established by a preponderance of the evidence but must be submitted to the jury when

_____

[17] Although vessel status is a substantive issue in that it relates to "the reach and application" of the statute, González, 311 F.3d at 443, it is not an element of the offense. See 46 U.S.C. § 70504(a); United States v. Vilches-Navarrete, 523 F.3d 1, 20 (1st Cir. 2008).

-31-

put in issue.  See United States v. Jackalow, 66 U.S. 484, 487-88 (1861); United States v. Perez, 280 F.3d 318, 330, 333-34 (3d Cir. 2002).  Conversely, petty offenses are tried to the court but subject to the beyond a reasonable doubt standard.  See United States v. McFarland, 445 F.3d 29, 30-31 (1st Cir. 2006).[18]  Even in constitutional law, the judge/jury issue can be separated from the standard of proof issue.  For example, there is no federal constitutional right to a jury trial in juvenile delinquency proceedings, see McKeiver v. Pennsylvania, 403 U.S. 528, 547 (1971), yet the charges in such proceedings must nevertheless be proved beyond a reasonable doubt, see In re Winship, 397 U.S. 358, 364 (1970).  As these authorities indicate, Congress's decision to "remove from the jury and confide to the judge" the question of vessel status, González, 311 F.3d at 443, does not necessarily imply that Congress intended to lower the government's burden of proof as well.  The two issues, though "interrelated," Sullivan v. Louisiana, 508 U.S. 275, 278 (1993), are ultimately separate.

Finally, the majority says that the preponderance of the evidence standard "comports with Congress' aim to facilitate

---

[18]   Other judge-determined issues are subject to higher and lower standards of proof. See, e.g., Huddleston v. United States, 485 U.S. 681, 690 (1988) (noting that a court resolves a question of relevancy conditioned on fact by deciding "whether the jury could reasonably find the conditional fact"); United States v. Ruiz-Gaxiola, No. 08-10378, 2010 WL 3720211, at *5 (9th Cir. Sep. 24, 2010) (holding that facts justifying forced administration of antipsychotic medication must be established by clear and convincing evidence).

enforcement."  But, of course, the same could be said of every issue in a criminal case.  Congress always and understandably wants criminals to be brought to justice.  That fact is not a license to interpret every criminal statute as broadly as possible.  Congress is also mindful of individual rights, international law, and the need for substantive and procedural limitations on the federal criminal power.  The question in this case, as in every case, is where Congress struck the balance between those considerations and the desire to punish wrongdoers.  The majority's unelaborated reference to Congress's "aim to facilitate enforcement" does not meaningfully advance that inquiry.  To the contrary, it tends to obscure the nuanced approach that Congress took in the statute.  Cf. Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 374 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.").

Hence, in my view, Congress's silence is evidence that it did not intend to alter the standard of proof.

### III.

Even assuming that preponderance of the evidence is the correct standard, the government did not meet that standard in this case.  It was the government's burden to prove that the defendants' yola was a "vessel without nationality."  That statutory phrase dates

to the original Marijuana on the High Seas Act, which left the term undefined.  It was evidently meant to refer to vessels that would be considered stateless under international law.  Congress subsequently added three specific examples of "vessel[s] without nationality" to the statute.  See 46 U.S.C. § 70502(d)(1) (quoted infra).  As the majority correctly holds, Congress did not intend those three examples to be exhaustive.  The MDLEA extends to vessels that are considered stateless under international law, even if those vessels do not fall within one of the specifically enumerated categories.[19]  See United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (Alito, J.).

International law, in turn, largely leaves the allocation of vessel nationality to national law.  Each country "may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it."[20]  Lauritzen v. Larsen, 345 U.S. 571, 584 (1953);

---

[19]    The MDLEA provides that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter."  46 U.S.C. § 70505. That provision simply means that international law does not supply an independent basis for defending against an MDLEA prosecution.  To the extent that international law informs the scope of the statute itself, it must necessarily be considered in determining whether a defendant's conduct falls within the statute.  Cf. United States v. Alvarez-Machain, 504 U.S. 655, 666 (1992) (distinguishing between the invocation of international law as "an independent basis for the right respondent asserts not to be tried in the United States" and the invocation of international law to "inform the interpretation of the Treaty terms").

[20]    A vessel that has been granted the nationality of a particular country is often said to sail "under the flag" of that country (the "flag state") or to be entitled to "fly the flag" of

-34-

see also Purchase of Ships of Belligerents by Neutrals, 6 Op. Att'y Gen. 638, 640 (1854) ("The law of nations and common sense combine to require that every ship shall have a nationality, defined and evidenced in each case according to the municipal law of the particular nation to which the ship appertains.").

In some countries, the law provides that any ship meeting certain conditions (e.g., ownership by a national) is considered a national ship. See H. Meyers, The Nationality of Ships 147 (1967). In other countries, nationality must be bestowed through an affirmative act of the government. Id. Still other countries link nationality to registration, granting their nationality automatically to ships that are registered in accordance with the law. Id. Many countries, including the United States, combine elements of the different systems. See 46 U.S.C. § 70502(b); Ted L. McDorman, Stateless Fishing Vessels, International Law and the U.N. High Seas Fisheries Conference, 25 J. Mar. L. & Comm. 531, 533 (1994) ("Practice in the United States suggests that where a vessel is not registered, the nationality of the vessel can become that of the vessel's owner."); The Chiquita, 19 F.2d 417, 418 (5th Cir. 1927) ("If [a vessel] is not properly registered, her nationality is still that of her owner.").

---

that country. See, e.g., Convention on the High Seas art. 5, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82. To prevent confusion with the national flag that is often flown from the stern of a ship, I avoid those metaphors in favor of the term "nationality."

A vessel either has a given nationality or it does not. It is therefore incorrect to suggest, as the majority does, that whether a vessel is stateless depends upon the circumstances in which it is encountered. See Majority Opinion at 13 ("The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality." (emphasis added)). Under international law, a stateless vessel is simply one that does not have a valid grant of nationality from any country. See Rosero, 42 F.3d at 171. That may be the case if, for example, no country has ever granted the vessel nationality; if a country has canceled its grant of nationality; or if the political entity that granted the vessel nationality is not a recognized international person. Id.

Because statelessness is the absence of nationality, the task of establishing that a vessel is genuinely stateless can "present the difficulties often associated with proving a negative." Rosero, 42 F.3d at 171. International law deals with this problem by permitting nations to deem a vessel that "repeatedly, deliberately, and successfully" obscures its nationality to be stateless, irrespective of whether the vessel is genuinely stateless. Meyers, supra, at 322. In a similar vein, a vessel that claims the nationality of two or more countries according to convenience is "assimilated to" (in the sense of "rendered similar to" or "deemed to

-36-

be") a vessel without nationality, even if it legitimately possesses a nationality. Convention on the High Seas art. 6(2). These rules operate as sanctions, effectively penalizing vessels that attempt to evade law enforcement authority on the high seas.

Congress took this notion of "deemed" statelessness a step further in the MDLEA. Under the statute, three additional categories of vessels that make false or evasive claims of nationality are deemed to be stateless:

> (A)   a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B)   a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C)   a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

To summarize, international law and the MDLEA recognize two basic categories of vessels without nationality. In the first category are vessels that are genuinely stateless under international law, in the sense that they do not have a valid grant of nationality from any country. In the second category are vessels that are deemed

-37-

to be stateless because they have attempted to obscure their nationality. I will discuss each of these categories in explaining why I do not believe the government carried its burden of proving that the defendants' yola fell within the scope of the MDLEA.

## A. Genuine Statelessness

The government argues that the yola was genuinely stateless because the defendants "were not flying a flag, carried no documentation, and never claimed to the Coast Guard that their ship was registered in the Dominican Republic or flew a Dominican flag." Insofar as the government means to suggest that any vessel that fails to affirmatively signal its nationality through a flag, documents, or an oral claim of registry becomes stateless under international law, it is mistaken. Registration, documentation, and the flag are "indicators" of vessel nationality, but they are not sources of vessel nationality. See Meyers, supra, at 138-140; see also Lauritzen, 345 U.S. at 584 ("Nationality is evidenced to the world by the ship's papers and its flag." (emphasis added)); The Mohawk, 70 U.S. 566, 571 (1865) ("The purpose of a register is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found."); Henry Wheaton, Elements of International Law 425 n.163 (Richard Henry Dana, Jr., ed., 8th ed. 1866) (distinguishing between a vessel's "ostensible nationality," which is indicated by its flag and documents, and its "actual

-38-

nationality, which depends on the domicile of the owner and other facts").

Under international law, "[a] vessel may be considered as possessing the nationality of a State even though she is unregistered, possesses no documents evidencing that nationality, nor even flies the flag of that State."[21] N.P. Ready, Ship Registration 3 (3d ed. 1998); see also McDorman, supra, at 533 ("Determining vessel nationality . . . is not just a question of documentation of the vessel[,] and a vessel literally without a flag, not being a vessel registered in a country, is not necessarily stateless or without nationality."); Rosero, 42 F.3d at 172-73 (holding that it was error to instruct the jury that it could find a vessel genuinely stateless "based on an unstructured weighing of the totality of the evidence," including various indicators of nationality). Even pirate ships possessing no documents and flying the flag of an unrecognized insurrectionary movement do not necessarily lose their nationality. See Convention on the High Seas art. 18 ("A ship or aircraft may retain its nationality although it has become a pirate ship or aircraft. The retention or loss of nationality is determined by the law of the State from which such nationality was derived."); United

---

[21] One commentator colorfully illustrates this principle: "According to international law the flying of the national flag was never the cause of -- or the condition for -- [nationality]. When the last bunting on board was blown to tatters, this never had radical legal consequences, nor had the hoisting of the flag." Meyers, supra, at 162.

Nations Convention on the Law of the Sea art. 104, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 3 (same). The question in every case turns on national law.

There is a separate question of whether the absence of a flag and documentation, though not directly affecting a vessel's nationality, can provide circumstantial evidence of statelessness. I believe it can. Common sense suggests that a vessel that lacks the usual indicators of nationality is more likely to be stateless than an equivalently situated vessel possessing such indicators. Cf. Fed. R. Evid. 401. But even acknowledging that to be so, it does not mean that proof that a vessel lacks the usual indicators of nationality is alone sufficient to justify the inferential conclusion that the vessel is, in fact, stateless. The reasonableness of such a conclusion will depend on other factors that are particular to each case.

It is not necessary to enumerate those factors comprehensively to see that such an inference is not warranted here. The yola in question was a small wooden boat equipped with an outboard motor. It undisputedly originated in the Dominican Republic and was carrying Dominican crew members. It was sighted just outside Dominican territorial waters (within the Dominican Republic's Exclusive Economic Zone) and was obviously incapable of making long international voyages. Although the vessel was not carrying documentation, "[m]any states . . . do not issue documents to ships with a tonnage below a given figure." Meyers, supra, at 160; see also

R.R. Churchill & A.V. Lowe, The Law of the Sea 213 n.19 (3d ed. 1999) (noting that "a State may not require, or permit, the registration of ships below a certain size, for example, but may nonetheless regard such ships as having its nationality if they are owned by its nationals"). Defendant Soto-Pérez testified at trial that the yola was owned by a Dominican man and was registered in some fashion with the Dominican government.

All of this evidence points strongly toward Dominican nationality. The government, which bore the burden of proving that the yola was stateless, offered nothing to rebut or undermine that conclusion. It submitted no evidence regarding Dominican law on nationality, presented no statement from a Dominican official, and generally made no attempt to eliminate the Dominican Republic as the most plausible candidate for nationality. Nor did the government obtain the Dominican Republic's consent to prosecution, see 46 U.S.C. § 70502(c)(1)(C), which could have provided a fallback position in the event that the evidence of statelessness proved deficient.[22] The district court, for its part, appears to have shifted the burden of proof to the defendants. At one point, the judge told defense counsel: "You could have brought the owner of the boat to testify. You could have done that. He would have told you yes, this was my

_____

[22] The majority's suggestion that the transfer of the crew by the Dominican Coast Guard may have constituted informal consent is interesting, but it is not an appropriate basis for affirming the judgment in this case. Consent was not charged in the indictment, argued below, or raised on appeal.

-41-

boat.  I bought it.  I have pictures of the boat.  Here they are.  I have it registered.  Brought certified papers of the registry.  All those things could have been done."  Needless to say, it was not the defendants' burden to prove that their boat fell outside the scope of the statute.

Given all the circumstances, I believe it was erroneous for the district court to conclude, based solely on the lack of a flag and documentation, that the defendants' vessel was genuinely stateless.  Those factors would almost certainly have justified the detention and boarding of the yola, which may be based on a "reasonable suspicion" that a vessel is stateless.[23]  See United States v. Williams, 617 F.2d 1063, 1082 (5th Cir. 1980) (en banc); Proposed Interdiction of Haitian Flag Vessels, 5 Op. O.L.C. 242, 243 n.4 (1981) ("Ships flying no flag may also be stopped to determine if they are stateless.").  But the question of whether there are reasonable grounds for detaining and searching a vessel is "separate" from the question of whether the vessel is truly stateless and, as such, falls within the ambit of the MDLEA.  United States v. Potes, 880 F.2d 1475,

---

[23]    As it happens, the Dominican Republic has given the United States blanket authorization to board and search any Dominican vessel on the high seas "suspected of illicit traffic" in drugs.  Agreement Between the Government of the United States of America and the Government of the Dominican Republic Concerning Maritime Counter-Drug Operations, U.S.-Dom. Rep., art. 10, Mar. 23, 1995, T.I.A.S. No. 12620.  However, the Dominican Republic has retained the "primary right" to prosecute the individuals on board such a vessel.  Id. art. 11.

1478 (1st Cir. 1989).  On the facts of this case, I do not believe the government satisfied its burden of proving the latter.

## B.  Deemed Statelessness

The question, then, is whether the yola can be deemed to be stateless.  The majority concludes that it can.  My colleagues rely primarily on the provision extending the MDLEA to "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel."  46 U.S.C. § 70502(d)(1)(B).[24]  Pursuant to the text of that provision, the failure to claim nationality has legal consequences only in specific circumstances: when a specified individual aboard the vessel fails to respond to a federal law enforcement officer's request for a claim of nationality.

Here, however, no federal officer requested the yola's nationality while the defendants were still on board the vessel. Officer Young questioned the defendants after they were picked up by the Dominican Coast Guard.  Among other things, he asked "if anybody would like to speak for the boat and give [him] a claim of nationality."  The defendants "shook their heads no, and actually did

---

[24] The majority also suggests that the defendants' failure to make an "affirmative claim of nationality" is on its own enough to bring them within the scope of the MDLEA.  That suggestion finds no support in the statute, which addresses the failure to claim nationality in a separate section that is inapplicable here. See 46 U.S.C. § 70502(b)(2)(B).

-43-

not give [him] a full response."[25]  I will assume that this exchange would ordinarily constitute a request for, and a failure to make, a claim of nationality under the MDLEA.  The issue remaining is whether the statute's requirement that the questioning take place "aboard" the suspect vessel includes within its scope questioning that took place "aboard" the Dominican cutter.

The majority concludes that "aboard" as used in section 70502(d)(1)(B) is sufficiently elastic to embrace the questioning that took place here, despite my colleagues' recognition that the circumstances fall outside the MDLEA if "aboard" is given its common meaning of "on board."[26]  In essence, the majority concludes that "near" the yola is close enough to "aboard" the yola in light of the other indicators of statelessness, including the absence of a flag or registry papers and the crew's failure to make an affirmative claim of nationality.

But a court does not have license to expand the scope of a criminal statute merely because it believes that doing so is

---

[25] Officer Young further testified: "I asked who was the captain of the vessel they were on or the senior person, and they responded that there was no single person in charge. . . .  Because I could not get one individual to make a claim for the vessel, I then questioned what was the nationality of the personnel.  And they had all told me and informed me that they were from the Dominican Republic.  I asked if the boat had come from the Dominican Republic as well, and they, in turn, agreed."

[26] The majority observes in a footnote that the dictionary definitions of "aboard" include "alongside of."  As described <u>infra</u>, however, the international law context leaves no doubt that Congress had the ordinary usage of the word in mind.  <u>See</u> <u>infra</u>.

consistent with Congress's law enforcement objectives. In enacting the MDLEA, Congress was acting against the backdrop of international law. As noted earlier, the international standard for deeming statelessness requires proof that a vessel "repeatedly, deliberately, and successfully" obscured its nationality. Meyers, supra, at 322. The MDLEA criteria for deeming statelessness, allowing such a determination based on a single failure to respond, are significantly less demanding and may in fact overstep international norms. See Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes, 93 Minn. L. Rev. 1191, 1228 (2009) ("[T]he MDLEA's definition of statelessness goes far beyond what is recognized by international custom or convention."). Although Congress has the prerogative to go beyond the limits of international law, see, e.g., Bradley, supra, at 331 ("Congress is free to override the limitations of international law, including the international law of prescriptive jurisdiction, when enacting a criminal statute."), we exceed our authority if we go beyond Congress in this sensitive realm.

There is every reason to conclude that Congress did not include the word "aboard" in section 70502(d)(1)(B) casually. To the contrary, the boarding of vessels by law enforcement officials is a significant step, and allowing authorities to board for limited investigatory purposes is a traditional "exception to the principle of noninterference on the high seas." United States v. Postal, 589

-45-

F.2d 862, 870 (5th Cir. 1979); see also United States v. Ricardo, 619 F.2d 1124, 1130 n.4 (5th Cir. 1980). The doctrine of international common law known as the "right of visit," or the "right of approach," permits scrutiny of the conduct or nationality of suspicious vessels through inquiry that culminates in an "examination on board the ship." Convention on the High Seas art. 22;[27] see also, e.g., United States v. Romero-Galue, 757 F.2d 1147, 1149 n.3 (11th Cir. 1985) ("The 'right of approach' is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its nationality."); United States v.

---

[27] Article 22 of the Convention codifies the common law doctrine and states, in part:

1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her unless there is reasonable ground for suspecting:

(a) That the ship is engaged in piracy; or
(b) That the ship is engaged in the slave trade; or
(c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.

2. In the cases provided for in sub-paragraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

A Coast Guard cutter is considered a "warship" for purposes of this provision. Postal, 589 F.2d at 871 n.13 (citing Convention on the High Seas art. 8(2)); United States v. Cortes, 588 F.2d 106, 110 (5th Cir. 1979).

-46-

<u>Petrulla</u>, 457 F. Supp. 1367, 1372 n.1 (M.D. Fla. 1978) ("[T]he right of approach to determine nationality has long been recognized.").[28] Likewise, 14 U.S.C. § 89(a) gives the Coast Guard authority to board any vessel subject to the jurisdiction of the United States to "address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel." See <u>Williams</u>, 617 F.2d at 1076-77 ("Congress, in enacting section 89(a), created an exception to the principle of non interference that is analogous to the exceptions contained in article 22.").

Section 70502(d)(1)(B) thus exists within a larger context of maritime law in which officers are given limited authority to board vessels to complete their investigations. As I have noted, the authority conferred by that provision's language is, arguably, already beyond the bounds of international law. I can see no justification for broadening the statute's scope even further by ignoring its literal terms. If the majority were correct that failure to respond to questioning on an adjacent vessel is equivalent to questioning "aboard" the target vessel, what principle would distinguish inquiry at a Coast Guard station located just ashore? In such circumstances, the limited "right to visit" becomes a license to conduct questioning of a ship's crew wherever convenient for the authorities. In my view, neither scenario falls within a provision that deems a vessel

---

[28] Officer Young testified that the yola was boarded pursuant to a right of visit.

stateless based on a specific interaction that occurs "aboard" that vessel.[29]

Abiding by the plain language of the statute need not frustrate Congress's objective to prosecute maritime drug trafficking nor undermine law enforcement efforts. In this case, for example, the Coast Guard could likely have brought the defendants within the scope of the MDLEA by obtaining the consent of the Dominican Republic, the yola's apparent country of nationality. See 46 U.S.C. § 70502(c)(1)(C). Alternatively, the government could have alleged that the yola was either a Dominican vessel or a stateless vessel and further investigated its nationality after the defendants' arrest. Cf. United States v. Greer, 285 F.3d 158, 175 (2d Cir. 2002) (holding that the MDLEA's jurisdictional element may be satisfied by consent obtained "any time before trial"); United States v. Bustos-Useche, 273 F.3d 622, 627 (5th Cir. 2001) (same); United States v. Cardales, 168 F.3d 548, 552 (1st Cir. 1999) (finding jurisdictional requirement met where consent provided after Coast Guard's boarding of ship).[30] That

---

[29] The majority's observation that Congress used the word "includes" when it listed specific instances of deemed statelessness does not help its argument that section 70502(d)(1) reaches the circumstances here. To construe the word "aboard" as the majority proposes is effectively to nullify a limitation on the scope of the statute as enacted. The rules of statutory construction do not permit us to rewrite the statute by ignoring a word chosen by Congress. See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used.").

[30] Indeed, as noted supra, the United States has authority to search any Dominican vessel on the high seas suspected of involvement

the government failed to pursue those avenues in this case does not justify extending the scope of a criminal statute beyond its plain terms.[31]

## IV.

The issues raised in this appeal are difficult, and I respect the majority's thoughtful attempt to resolve them.  In the end, however, I fear that the majority's focus on Congress's "aim to facilitate enforcement" has overshadowed the considerations of fairness and international law that counsel restraint in interpreting the MDLEA.  The majority's interpretation extends United States drug laws to circumstances that Congress did not contemplate and that likely exceed the bounds of international law as well.  In addition, the majority has lowered the traditional standard of proof for finding guilt.  I would not reach either of those results in the absence of a clear statement that Congress intended its penal laws to reach so broadly.

For these reasons, I respectfully dissent.

---

in drug trafficking.  Because the Dominican Republic retains the right to prosecute individuals for such crimes, the United States presumably would transfer the custody of any arrested persons upon request from the Dominican government  if  the vessel were determined to be Dominican.

[31] Of course, federal officers may encounter scenarios in which an overly rigid reading of the statute would truly frustrate congressional purposes. See, e.g., Rosero, 42 F.3d at 174 ("By clear implication, . . . [the failure to claim nationality] provision applies when the master of a ship flees and leaves no one in charge . . . .").  This case does not present such a situation.